# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 24, 2022         Decided August 9, 2022

No. 21-5289

COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF
REPRESENTATIVES,
APPELLEE

v.

UNITED STATES DEPARTMENT OF THE TREASURY, ET AL.,
APPELLEES

DONALD J. TRUMP, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01974)

———

*Cameron T. Norris* argued the cause for appellants. With
him on the briefs was *William S. Consovoy*.

*Douglas N. Letter*, General Counsel, U.S. House of
Representatives, argued the cause for appellee Committee on
Ways and Means, United States House of Representatives.

With him on the brief were *Todd B. Tatelman*, Principal Deputy General Counsel, *Stacie M. Fahsel*, Associate General Counsel, *Eric R. Columbus* and *Michelle S. Kallen,* Special Litigation Counsel, *Seth P. Waxman, Kelly P. Dunbar, David M. Lehn, Andres C. Salinas, Susan M. Pelletier*, and *Katherine V. Kelsh*.

*Gerard Sinzdak*, Attorney, U.S. Department of Justice, argued the cause for Executive Branch appellees. With him on the brief were *Sarah E. Harrington*, Deputy Assistant Attorney General, and *Michael S. Raab*, Attorney. *Mark R. Freeman*, Attorney, entered an appearance.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellees.

Before: HENDERSON and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* HENDERSON.

SENTELLE, *Senior Circuit Judge*: The Chairman of the United States House of Representatives Committee on Ways and Means filed a statutory request for documents from the Department of the Treasury related to then-President Donald J. Trump and related entities. Treasury initially objected to the request, and the Committee filed this lawsuit. After a change of administrations, Treasury acquiesced, stating that it intended to comply with the request. In the meantime, the Trump Parties intervened in the action. The district court ruled in favor of the

Committee. Intervenors appeal. For the reasons set forth below, we affirm.

## I.   Background

As a general rule, Title 26, Section 6103 of the United States Code makes tax returns and return information confidential unless their release is authorized by an exception enumerated in that same section. 26 U.S.C. § 6103(a). Section 6103 includes a number of exceptions to the general rule of confidentiality but only one is at issue here. Section 6103(f)(1) provides that

> [u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives . . . the Secretary shall furnish such committee with any return or return information specified in such request . . . .

26 U.S.C. § 6103(f)(1). At bottom, this case simmers down to the constitutionality and application of § 6103(f)(1).

Operating separately from § 6103(f)(1), IRS regulations give the President's tax returns special consideration. While IRS audits are often random, the IRS has required the audit of the sitting President's tax returns since 1977. This Presidential Audit Program is a creature of IRS regulations and is not required or governed by statute. *See Internal Rev. Man.* § 3.28.3.5.3.

On April 3, 2019, Representative Richard Neal, Chairman of the Committee on Ways and Means ("the Chairman") invoked § 6103(f)(1) in a writing to the Commissioner of Internal Revenue ("the 2019 Request"). In the Request, the

Chairman requested the federal income tax returns of then-President Donald J. Trump as well as Donald J. Trump Revocable Trust, DJT Holdings LLC, DJT Holdings Managing Member LLC, DTTM Operations LLC, DTTM Operations Managing Member Corp., LFB Acquisition Member Corp., LFB Acquisition LLC, and Lamington Farm Club, LLC doing business as Trump National Golf Club—Bedminster (collectively "Appellants" or "the Trump Parties"). In his letter, Chairman Neal stated that the Committee was "considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." JA 46.

On May 6, 2019, the Department of the Treasury responded that it did not intend to comply with the 2019 Request because it was not supported by a legitimate legislative purpose. This position was supported by an Office of Legal Counsel opinion issued on June 13, 2019, which concluded that the Chairman's stated reasons for requesting the tax information were pretextual.

In receipt of Treasury's denial, the Committee filed suit against the Internal Revenue Service and its Commissioner and the Department of the Treasury and its Secretary (collectively "Treasury") to force compliance with the 2019 Request. The Trump Parties intervened in the case soon after.

While the case was pending in the district court, Joseph R. Biden was elected as President of the United States. He was inaugurated on January 20, 2021.

In June 2021, the Chairman again wrote to the Secretary of the Treasury and Commissioner of the Internal Revenue Service. Invoking § 6103(f)(1), the Chairman requested the

same information regarding the Trump Parties ("the 2021 Request"). However, in this Request, the Chairman provided more detail as to why the Committee wanted this information. Generally, Chairman Neal stated that the Committee continued "to consider and prioritize legislation on equitable tax administration, including legislation on the President's tax compliance, and public accountability" and legislation related to the IRS's mandatory audit program of the sitting President's returns.

Upon receipt of the 2021 Request, Treasury again consulted the Office of Legal Counsel. In July 2021, the Office released a second opinion, this time concluding that the 2021 Request was valid, and therefore that Treasury had no choice but to comply with it per the mandatory language of § 6103(f)(1).

After the second Office of Legal Counsel opinion was issued, Treasury informed the district court and the Trump Parties that it intended to comply with the 2021 Request and provide the Committee with the requested materials. The Committee then voluntarily dismissed the Complaint it had filed against Treasury. Upon learning that Treasury intended to comply with the 2021 Request, the Trump Parties, still intervenors at that time, filed a crossclaim against the Department of the Treasury and its Secretary as well as the Internal Revenue Service and its Commissioner. In addition, the Trump Parties filed a counterclaim against the Committee. These claims allege that the 2019 and 2021 Requests were unlawful and therefore Treasury should not comply with them.

Against both the Committee and Treasury, the Trump Parties asserted that the Request lacks a legitimate legislative purpose and violates the separation of powers. Against Treasury, the Trump Parties alleged that § 6103(f)(1) is facially

unconstitutional and that compliance with the Request would be a violation of the First Amendment.

Across eight claims, the Trump Parties alleged that (1) the Request lacks a valid legislative purpose, (2) the Request violates the separation of powers, (3) Section 6103(f)(1) is facially unconstitutional, (4) the Treasury's change of position was motivated by retaliation and therefore violates the First Amendment, and (5) the Request violated the Trump Parties' Due Process rights. Both Treasury and the Committee filed motions to dismiss the cross and counterclaims for failure to state a claim.

In a thorough and well-reasoned memorandum opinion, the district court granted the motions to dismiss. *Committee on Ways and Means v. U.S. Dep't of the Treasury*, --- F. Supp. 3d. ---, 2021 WL 5906031 (D.D.C. Dec. 14, 2021). First, the district court held that the 2021 Request was supported by the valid legislative purpose of the Committee's study of the Presidential Audit Program. *Id.* at *7. Per the district court, Congress could seek these records to inform legislation regulating "how many staff the IRS may assign to the audit of a sitting President" or legislation to ensure funding to the Presidential Audit Program. *Id.* at *7.

The district court then, after debating the pros and cons of various tests, applied *Nixon v. Administrator of General Services* ("*Nixon v. GSA*") and determined that the Chairman's Request did not violate the separation of powers. *Id.* at *18, *21.

The district court went on to examine whether § 6103(f)(1) is facially unconstitutional by asking if the Trump Parties had shown that there was no set of circumstances under which the law would be valid. It determined that the Trump Parties had

failed to do so. *Id.* at \*20. It next found that Treasury's intent to comply with the 2021 Request is not out of retaliation against the Trump Parties, and therefore is not a violation of the First Amendment, because Treasury is required by statute to comply with a valid request. *Id.* at \*21. Finally, the district court held that there was no violation of the Trump Parties' Due Process Rights. *Id.* at \*22.

The Trump Parties timely appealed the district court's granting of the motions to dismiss.

## II.     Analysis

There are four issues before us on appeal: (1) Whether the Chairman's Request is supported by a legitimate legislative purpose, (2) whether the Chairman's Request violates the separation of powers, (3) whether § 6103(f)(1) is facially unconstitutional, and (4) whether Treasury's compliance with the Request would violate the First Amendment. We address each in turn.

We review the district court's granting of the motions to dismiss *de novo*. *Cierco v. Mnuchin*, 857 F.3d 407, 414 (D.C. Cir. 2017). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of the complaint, we accept the complaint's factual allegations as true. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). But "we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

8

**A.**

The Trump Parties contend that the Chairman's Request exceeds Congress's investigative powers. It does not.

The case law concerning Congressional requests for information is confined almost entirely to information sought via a Congressional subpoena. *See generally Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) (House committee subpoenas to private financial institutions for financial information); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) (Senate subcommittee subpoena to a bank for financial information); *Quinn v. United States*, 349 U.S. 155 (1955) (House subcommittee subpoena to individual to answer questions); *McGrain v. Daugherty*, 273 U.S. 135 (1927) (Senate subcommittee subpoena to individual to answer questions). Those cases are not directly on point in this case where the vehicle for requesting information was created by a statute passed by Congress and signed into law by the Executive. However, we see no reason that the case law shaping when and how Congress can request certain information via subpoena should not inform our analysis of Congress's ability to do so via statute.

Congress's authority to "secure needed information" is not enumerated in the Constitution. *McGrain*, 273 U.S. at 161. Regardless, it has long been held that the "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *Id.* at 174. This power is broad and indispensable, but it is not without limits. *Mazars*, 140 S. Ct. at 2031.

A Congressional request for information "is valid only if it is 'related to, and in furtherance of, a legitimate task of Congress." *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins v.*

*United States*, 354 U.S. 178, 187 (1957)). Generally, the request must "concern[] a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (quoting *McGrain*, 273 U.S. at 177). Congress does not have the "general power to inquire into private affairs and compel disclosures." *McGrain*, 273 U.S. at 173 (internal quotation marks omitted). "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200.

The Trump Parties contend that the Chairman's Request is an unconstitutional exercise of Congress's investigative powers for two reasons: because the Request is motivated by the improper purpose of exposing the Trump Parties' private financial information and because the Request does not identify a valid legislative purpose.

"There is no general authority to expose the private affairs of individuals without justification in terms of the functions of Congress." *Watkins*, 354 U.S. at 187. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* Similarly, Congress cannot exercise its investigative powers for the purpose of law enforcement because the power of law enforcement is vested in the executive and judicial branches. *Quinn*, 349 U.S. at 161. But that an investigation "might possibly disclose crime or wrongdoing" does not invalidate an otherwise proper investigation. *McGrain*, 273 U.S. 179–80.

The Trump Parties claim that the Chairman's Request is mere pretext for an unconstitutional ulterior motive. In a deluge of citations to statements of individual committee members, statements made during Committee debate, reports published by Representative Neal, statements from the Speaker of the

House of Representatives, an op-ed, interview statements, social media posts, and statements of Representatives who are not members of the Committee, the Trump Parties assert that the true purpose behind the Chairman's Request is to expose the Trump Parties' tax returns to the public and to uncover evidence of criminal conduct. However, they are looking for evidence of improper purpose in the wrong place.

"[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it." *Eastland*, 421 U.S. at 508. The Speech or Debate Clause, U.S. Const. art. 1, § 6, cl. 1, protects against inquiry into the motives behind the regular course of the legislative process, *Eastland*, 421 U.S. at 508. It is not our function to "test[] the motives of committee members for this purpose." *Watkins*, 354 U.S. at 200. "Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Id.*

Where, then, do we look for the purpose of the 2021 Request? For committee subpoenas, we have looked to resolutions from the Committee. Here, where the Chair of the Committee is authorized by statute to request the information on his own without a committee vote, we look to the Chairman's written requests.

The Trump Parties insist that we can look only to the 2019 Request for a valid legislative purpose because they have "plausibly alleged . . . that the 2019 [R]equest was narrowed in 2021, not reissued." Appellant Br. at 30. But Appellants cannot constrain what documents we consider through allegations in their Complaint. The Chairman's ability to request tax returns and return information is governed by § 6103(f)(1). Nothing in the statute constrains how many requests the Chairman can submit or with what frequency he can submit them. The

Chairman was free to supplement or supersede the 2019 Request with the 2021 Request, and that is where we will look for whether the Request is supported by a legitimate legislative purpose.

The 2021 Request identifies two potential subjects on which Congress could legislate and therefore investigate. First, the administration of the tax laws as they apply to a sitting President. Second, a sitting President's conflicts of interest. Because we conclude that the requested returns and return information could inform tax legislation concerning the President, we do not reach the question of whether it could inform legislation concerning a President's conflicts of interest.

Throughout the 2021 Request, the Chairman makes it clear that the Committee is concerned about "the extent to which the IRS audits and enforces the Federal tax laws against a President." JA 87. Specifically, the Committee requires information concerning the Presidential Audit Program.

In 1974, the public learned that the IRS had failed to properly examine President Nixon's tax returns. JA 87–88. This led to the IRS implementing the Presidential Audit Program. This program subjects every sitting President's tax returns to mandatory review by the IRS. *Internal Rev. Man.* 4.8.4.2. To this date, this program is solely regulated by IRS regulations and has not been codified in statute.

According to the 2021 Request, "[t]he Committee has reason to believe that the mandatory audit program is not advancing the purpose for which it was created, which may require Congress to act through legislation." JA 88. The Committee wants "assurance that sufficient safeguards exist to shield a revenue agent from undue influence at the hands of a President trying to secure a favorable audit." *Id.* The

Committee "seeks to explore legislation intended to ensure that IRS employees in any way involved in a President's audit are protected in the course of their work and do not feel intimidated because of the taxpayer's identity." *Id.* The Committee also intends to explore "whether agents have had access to the necessary resources to undertake an exhaustive review of a complex taxpayer on an annual basis." *Id.* at 89.

The Request includes an explanation as to why the Trump Parties' tax returns and return information are particularly relevant to their inquiry. According to the Chair, President Trump was a unique taxpayer as a President because his returns were "inordinately large and complex." JA 90 (quoting Letter from Sheri A. Dillon and William F. Nelson to Mr. Donald J. Trump, *Re: Status of U.S. federal income tax returns* (March 7, 2016)). The Committee is concerned that the regulations governing the Presidential Audit Program "do not account for such substantial business activities." JA 91. The Committee also cites to then-candidate Trump's and then-President Trump's public statements directed toward the IRS that the audit of his returns was "extremely unfair." JA 91–92.

The 2021 Request articulates a clear legislative purpose on a matter which legislation could be had: the Presidential Audit Program. The Trump parties insist that any legislation codifying the requirement that all Presidents undergo a mandatory audit would violate the separation of powers. But codifying the requirement of the audit is not the only legislation contemplated by the Committee in the 2021 Request. The Chairman states that the Committee is exploring the need for legislation that would provide further protection to the IRS employees conducting the audit and legislation ensuring that they have sufficient resources to conduct the audit even when the returns in question are "inordinately large and complex." The Chairman then goes on to explain why these specific

returns and return information are particularly relevant to this inquiry. This is all we can ask.

The Chairman has identified a legitimate legislative purpose that it requires information to accomplish. At this stage, it is not our place to delve deeper than this. The mere fact that individual members of Congress may have political motivations as well as legislative ones is of no moment. Indeed, it is likely rare that an individual member of Congress would work for a legislative purpose without considering the political implications.

The statements of individual Committee members and members who are not part of the Committee provided by the Trump Parties do not change this. The courts do not probe the motives of individual legislators. These motives are explicitly protected by the Speech or Debate Clause.

**B.**

The Supreme Court has made it clear that when a Congressional request for information concerns a President and his personal papers, we must also examine whether that request violates separation of powers principles.

A Congressional request for a President's information raises "significant separation of powers issues." *Mazars*, 140 S. Ct. at 2033. When Congress has requested a President's information, we "must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the 'unique position' of the President." *Id.* at 2035 (quoting *Clinton v. Jones*, 520 U.S. 681, 698 (1997)).

While it is clear from *Mazars* that we must consider how this Request implicates the separation of powers, that Donald Trump is a former President rather than a sitting President complicates the analysis. How we should evaluate a Congressional request for the information of a former President is less clear.

The parties disagree over which test should be applied in this case. The Executive Branch parties and the Committee ask that we apply the separation of powers test from *Nixon v. GSA*. 433 U.S. 425 (1977). The Trump Parties ask us to apply the test laid out in *Mazars*. 140 S. Ct. 2019 (2020).

This Court recently addressed this question in the most recent iteration of the *Mazars* litigation, *Trump v. Mazars USA, LLP*, --- F.4th ---, No. 21-5176, 2022 WL 2586480 (D.C. Cir. July 8, 2022) ("*Mazars V*"). In *Mazars V*, the panel was similarly confronted with a Congressional request for the personal information of a former President. Despite familiar arguments from the parties over which test should apply, the panel found no reason "to abandon the Supreme Court's *Mazars* test in the *Mazars* case itself." *Mazars V*, 2022 WL 2586480 at *8.

Therefore, it is likely law of the circuit that a Congressional request for a sitting President's personal information is evaluated under the heightened *Mazars* standard regardless of whether the President in question remains in office. *See id.* However, because of the possibility of further appellate review in both this case and *Mazars* and because of distinctions, likely without a difference, between the case before us and *Mazars*, we hold at the outset that the Chairman's request in this case passes muster under all suggested variations of the separation of powers analysis. We walk through each in turn.

### 1. *Nixon v. GSA*

The Committee insists that the proper test for determining whether the Request violates the separation of powers was laid out by the Court in *Nixon v. GSA*. In that case, former President Nixon brought a challenge to the Presidential Recordings and Materials Preservation Act ("the PRMPA"). The PRMPA was passed by Congress in reaction to the Watergate scandal. *Nixon v. GSA*, 433 U.S. at 430–433. The Act required the Administrator of the General Services Administration to acquire and store certain Nixon administration records. *Id.* at 434. Former President Nixon challenged the PRMPA as a violation of the separation of powers.

In *Nixon v. GSA*, the Court held that in determining whether Congress has "disrupt[ed] the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. GSA*, 433 U.S. at 443 (citing *United States v. Nixon*, 418 U.S. 683, 711–12 (1974)). "Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Id.*

In applying this test to the PRMPA, the Court held that "nothing contained in the Act render[ed] it unduly disruptive of the Executive Branch. . . ." *Id.* at 445. In particular, the Court noted that the PRMPA was minimally intrusive because the Executive Branch itself retained custody of the disputed materials, and there was "abundant statutory precedent" requiring disclosure of certain Executive Branch records. *Id.*

Applying *Nixon v. GSA* to the case before us, we must first ask if the Chairman's Request has created any potential disruption of the "Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. GSA*, 433 U.S. at 443. As noted by the district court, the only alleged burden to the Executive Branch is that Congress could use § 6103(f)(1) requests of a former President in an effort to influence a sitting President's conduct while in office. *Committee on Ways and Means v. U.S. Dep't of the Treasury*, --- F. Supp. 3d. ---, 2021 WL 5906031, at *17 (D.D.C. Dec. 14, 2021). Because this does represent a "potential for disruption," we turn to "whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443.

This potential disruption, while extant, is minimal. For this disruption to occur, Congress would need to make a request under § 6103(f)(1) for the returns of a former President, and then in the traditional give-and-take between the Legislature and the Executive, threaten to do the same to the then-sitting President when he is no longer in office. While this is certainly possible, sitting Presidents, many of whom voluntarily release tax returns and return information, may view this as no burden at all. Therefore, the need demonstrated by Congress to justify that potential disruption of the Executive Branch does not need to be overwhelming.

We have already determined that the information requested by the Chairman concerns a subject on which legislation could be had: the efficacy of the Presidential Audit Program. This inherently means that the Chairman is acting within the "constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443. As for whether the "need" to legislate on this issue is overriding of the burden imposed on the Executive Branch, the Chairman made clear in his letter that the tax

returns and return information of the Trump Parties are unique among former Presidents, JA 90–91, and learning about how the audit of these complex returns proceeded is necessary to learn whether the Audit Program is sufficiently staffed and resourced to handle such complex information. In this case, the need for the Trump Parties' information to inform potential legislation overrides the burden to the Executive Branch largely because that burden is so tenuous. Were *Nixon v. GSA* the appropriate test to apply in this situation, the Trump Parties have failed to demonstrate a burden that would outweigh the Committee's need for the requested information.

### 2. *Mazars*

The Trump Parties insist that we should apply the test developed by the Court in *Mazars*. 140 S. Ct. 2019. In *Mazars*, then-President Trump petitioned the courts to enjoin his accounting firm from complying with House-issued subpoenas. 140 S. Ct. 2027–28. The Court found that existing frameworks for evaluating Congressional subpoenas were insufficient to account for both the "significant legislative interests of Congress" and "the unique position of the President." *Id.* at 2035 (quoting *Clinton*, 520 U.S. at 698). The Court produced four factors that a court must consider when a Congressional request implicates the President's personal information:

> 1. "Whether the asserted legislative purpose warrants the significant step of involving the President and his papers[;]"
> 2. Whether the subpoena is "no broader than necessary to support Congress's legislative objective[;]"

3. Whether Congress has offered "detailed and substantial evidence" to show the subpoena furthers a valid legislative purpose; and

4. Whether the subpoena burdens the President as Chief Executive.

*Id.* at 2035–36. Because the Court of Appeals had not properly considered the House's request for the President's personal documents as an interbranch dispute, the Supreme Court remanded for reconsideration under this framework.

On remand, the district court was ordered to apply the *Mazars* four-part test, but a significant event prevented a simple application of facts to law. President Trump was no longer the sitting President, and the *Mazars* test was created with a sitting President in mind. Recognizing this, the district court created a "*Mazars* lite" test, "that is, an examination of the *Mazars* factors cognizant of the fact that this case now involves a subpoena directed at a former President." *Trump v. Mazars USA LLP*, 560 F. Supp. 3d 47, 65 (D.D.C. 2021) ("*Mazars IV*"). Under *Mazars* lite, the analysis of each *Mazars* factor is somewhat less rigorous because the request at issue concerns a former President rather than a sitting President. *Mazars IV*, 560 F. Supp. 3d at 65–66. According to the Trump Parties, if we conclude that *Mazars* is not the correct framework to apply in this case, we should apply *Mazars* lite or a test like it.

While the district court's development of the *Mazars* lite test is well reasoned, we do not need to decide which version of *Mazars* should be applied because the Chairman's Request survives the application of the more-rigorous *Mazars*.

First, we must "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." *Mazars*, 140 S. Ct. at 2035. Because "confrontation between the two branches should be avoided whenever possible," *Cheney v. United States Dist. Court. for Dist. of Columbia*, 542 U.S. 367, 389–90 (2004) (internal quotations omitted), "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective," *Mazars*, 140 S. Ct. at 2035–36. Congress cannot look to the President as a "case study" for general legislation, and the legislative process does not necessarily require "full disclosure of all the facts" in the way that criminal proceedings do. *Id.* at 2036 (citations omitted).

The Committee has asserted that its legislative purpose is to assess the effectiveness of the Presidential Audit Program. In particular, the Committee is interested in whether the program is adequately resourced and sufficiently guarded from external pressures. The Committee is evaluating a program that applies only to the President and Vice President; this is not a case study for general legislation. *Mazars*, 140 S. Ct. at 2036. This is not an attempt by Congress to rely on the President's information when "other sources could reasonably provide Congress the information it needs. . . ." *Id.* at 2035–36.

While the Committee could possibly have received similar information by requesting the returns and return information of different former Presidents or the sitting President, this does not tilt this factor to weigh in the Trump Parties' favor. Any path the Committee could take to inform themselves about the adequacy of the Presidential Audit Program would require them to access the personal information of a former President. There is no other source that would reasonably provide the

Committee with the information it seeks while also completely circumventing separation of powers concerns.

Second, Congress's requests for a President's personal information should be "no broader than reasonably necessary to support Congress's legislative objective." *See Mazars*, 140 S. Ct. at 2036. This is a "safeguard against unnecessary intrusion into the operation of the Office of the President." *Id.* (quoting *Cheney,* 542 U.S. at 387). In the 2021 Request, the Chairman requested the Trump Parties' tax returns and return information for each of the tax years 2015–2020. JA 92. The Chairman also requested additional information about each return

> specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

*Id.* at 92–93. By requesting information from tax years 2015–2020, the Chairman has requested one return that would have been filed before President Trump assumed office, the four returns filed while in office, and one return filed after President Trump left office.

The Trump Parties contend that the Committee should not need to look at more than one year's worth of information and should only need access to the audit files but not the returns themselves. The Trump Parties also assert that the returns and return information from before and after President Trump was in office are irrelevant to the Committee's inquiry. Finally, the Trump Parties insist that the Request is overbroad because it makes no promises of confidentiality.

The Chairman's Request has not clearly gone beyond the scope of the Committee's inquiry. It is understandable that the Committee would want to compare returns filed during the presidency with those filed in the years before and after to see what effect, if any, Mr. Trump being the sitting President had on how his returns were treated by the Presidential Audit Program. Further, there is no reason that the Chairman's Request should be confined to a single year of returns and return information. The Chairman has stated that the value of requesting six years of information is the ability to compare one year with another. And while it is possible that not every document requested by the Chairman will provide the Committee with the sought-after information, that is of no consequence. The Committee is permitted to go "up some 'blind alleys' and into nonproductive enterprises." *Eastland*, 421 U.S. at 509.

A Congressional request for information does not need to ensure confidentiality to remain valid. *United States v. Rumely*, 345 U.S. 41, 43 (1953) ("It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees." (internal quotation marks and citation omitted)). When an inquiry uncovers information worthy of legislation, that information often comes to light. This is particularly true with regard to tax returns. There is no constitutional guarantee to the privacy of tax returns. Rather,

the privacy of tax returns is a creature of statute, the same statute that authorizes the Chairman to request this information. *See* 26 U.S.C. § 6103.

However, despite no guarantee of confidentiality in the Chairman's Request, the statute does address the Trump Parties' concerns. "[A]ny return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure." 26 U.S.C. § 6103(f)(1). What occurs during an executive session of a committee may not be disclosed to the public without a vote of the committee. Rules of the House of Representatives, 117th Cong., Rule XI, cl. 2(k)(7) (2021).

Third, we must be "attentive to the nature of the evidence offered by Congress to establish that a [request] advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "The more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* When the contemplated legislation "raises sensitive constitutional issues . . . it is 'impossible' to conclude that a [request] is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Id.* (citing *Watkins¸* 354 U.S. at 205–06, 214–15).

In this case, the evidence cited in the 2021 Request is primarily statements by President Trump or his agents. President Trump's own tax attorneys stated that his returns were "inordinately large and complex." JA 90. The Chairman then cited to then-candidate Trump's public statements referring to the audits of himself and his assets as unfair. JA 91. The Chairman even cited to the President's own statement,

delivered via the White House Press Secretary, describing the Presidential Audit Program as "extremely unfair." JA 91–92.

These public statements directly relate to the areas of the Presidential Audit Program that the Chairman intends to investigate: whether it is sufficiently resourced to audit a President with large and complex returns, and whether those conducting the audit have been improperly influenced by President Trump's statements regarding the Presidential Audit Program. These statements do not provide irrefutable proof that the Audit Program is lacking in resources or unable to insulate itself from outside pressure, but that is not required. The Committee is relying on public, verifiable sources rather than on anonymous tips or pure conjecture.

Fourth, we must "be careful to assess the burdens imposed on the President by a [request]." *Mazars*, 140 S. Ct. at 2036. "[B]urdens imposed by a congressional [request] should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use [requests] for institutional advantage." *Id.*

This *Mazars* factor is difficult to assess in this case. President Trump is no longer in office, and the current administration has stated before the Court that it intends to comply with the Chairman's Request. Therefore, the question presents itself of which burden should be examined. Do we look at the burden the Request places on former President Trump and the other Trump Parties, or do we look at the burden these requests place on the current President? However, in this case, we do not need to decide because after considering both possible burdens, we find that the Request does not impose a burden that would violate separation of powers principles.

The Trump Parties insist that the Request imposes too great a burden because it threatens to expose private financial information of the Trump Parties and will deny the Trump Parties their due process rights by interfering with an ongoing audit. These certainly are burdens on the Trump Parties. As discussed above, should the Committee find it necessary, it is possible that the information turned over to the Chairman might be made public. This is certainly inconvenient, but not to the extent that it represents an unconstitutional burden violating the separation of powers. Congressional investigations sometimes expose the private information of the entities, organizations, and individuals that they investigate. This does not make them overly burdensome. It is the nature of the investigative and legislative processes.

The Trump Parties further urge us to consider the burden that this Request imposes on the sitting President. They claim that it would hinder Congress's "ongoing relationship with the President," *Mazars*, 140 S. Ct. at 2036, because this would empower a future Congress to threaten or influence the sitting President with invasive requests once he leaves office. As we discussed in our *Nixon v. GSA* analysis, this burden is not substantial. While it is possible that Congress may attempt to threaten the sitting President with an invasive request after leaving office, every President takes office knowing that he will be subject to the same laws as all other citizens upon leaving office. This is a feature of our democratic republic, not a bug.

While the provided list of factors to consider in *Mazars* may not be exhaustive, none of the provided four factors weigh in favor of enjoining the 2021 Request. Therefore, we do not see the need to consider any others. Applying the *Mazars* or even the *Mazars* lite test, the Trump Parties' attempt to halt the Committee's investigation fails.

The separation of powers analysis in this case has required much discussion of the intrusion by Congress into the Executive Branch and the personal life of the Trump Parties and the burden that such intrusions impose. While the burden to the Trump Parties having their returns and return information shared with the Committee is concrete, any burden to the sitting President or the Executive Branch as a whole is tenuous at best. Regardless, neither burden, under any test, proves sufficient to require us to enjoin the Chairman's Request for the returns and return information.

The Trump Parties also contend that § 6103(f)(1) is facially unconstitutional and therefore the Chairman's Request is invalid. Rather than arguing that there is no set of circumstances under which § 6103(f)(1) could be constitutionally applied, the Trump Parties misconstrue precedent to argue that the statute is unconstitutional because it fails to state a "valid rule." Appellant Br. 23. According to the Trump Parties, when a key limitation is missing from the statutory text, the statute is unconstitutional. Applying this rule to § 6103(f)(1), the Trump Parties argue that the statute empowering the Chairman to request tax returns and return information from Treasury must also include a requirement that the request have a legitimate legislative purpose, otherwise the statute cannot stand. However, this argument misstates the test for assessing the facial constitutionality of a statute and misunderstands the case law supporting it.

As recently as last year, the Supreme Court has confirmed that outside of the First Amendment context, "a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373,

2387 (2021) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), "or show that the law lacks 'a plainly legitimate sweep,'" *id.* (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

In support of their argument, the Trump Parties rely on this Court's decision in *Gordon v. Holder*, 721 F.3d 638 (2013), to support their "no valid rule" test. In that case, a plaintiff sought a preliminary injunction against the Prevent All Cigarette Trafficking Act ("PACT Act") which would require him to collect and pay all state and local taxes in advance of a delivery of his products. If a seller failed to do so, they were subject to federal criminal and civil penalties. *Gordon*, 721 F.3d at 642. The statute in question did not include an explicit requirement that the seller must first have established minimum contacts with a jurisdiction before being required to pay taxes obligated by the jurisdiction.

In considering the breadth of a preliminary injunction, we stated that "when a statute erases the boundaries that define a sovereign's jurisdiction, as the PACT Act does to the boundaries of state and local taxing jurisdictions, any legitimate application is pure happenstance," and that laws like this "led the Supreme Court to sustain facial challenges to laws that omit constitutionally-required jurisdictional elements, even though all such laws necessarily have a 'plainly legitimate sweep.'" *Id.* at 654. In support of this statement, we pointed to *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000). In those cases, the Supreme Court permitted facial challenges to the Gun-Free School Zones Act of 1990 and the Violence Against Women Act on the grounds that they lacked a clear jurisdictional hook. *Lopez*, 514 U.S. at 551; *Morrison*, 529 U.S. at 613.

But neither *Gordon*, *Lopez*, nor *Morrison* are comparable to the case before us. Those cases permitted facial challenges to statues criminalizing private conduct. The statute before us now, § 6103(f)(1), does not penalize private conduct, it regulates how the government interacts with itself. To succeed, the Trump Parties must show that there is no set of circumstances under which § 6103(f)(1) can be constitutionally applied. If the statute is constitutional in "at least one scenario," the facial challenge fails. *Chemical Waste Mgmt. v. EPA*, 56 F.3d 1434, 1437 (D.C. Cir. 1995)).

This statute can be properly applied in numerous circumstances, including the one before the court. The Chairman could request returns and return information to inform legislation concerning the Tax Code or the laws provisioning the Treasury Department. Section 6103(f)(1) is not facially unconstitutional.

Finally, the Trump Parties contend that Treasury's intent to comply with the Chairman's Request violates their First Amendment rights because Treasury is politically motivated. Those being investigated by Congress do not lose the protections of the First Amendment. *Barenblatt*, 360 U.S. 109, 126 (1959). To state a claim for First Amendment retaliation, the Trump Parties must allege that they engaged in protected conduct, that the government took retaliatory action capable of deterring another from the same protected activity, and that there is a causal link between the two. *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018). The improper motive must be a but-for cause of the government action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

The Trump Parties have failed to state a claim for the reason that they cannot show that Treasury's decision to comply with the 2021 Request would not have happened absent a retaliatory motive. The language of § 6103(f)(1) is mandatory. The statute provides that "the Secretary *shall* furnish," 26 U.S.C. § 6103(f)(1) (emphasis added), the requested information to the Committee upon written request. When the Committee makes a request that is within its authority to make, *i.e.*, within Congress's investigative power, the Secretary does not have a choice as to whether to provide the information. Where, as here, the Executive Branch comes to the conclusion that a § 6103(f)(1) request is valid, JA 123, it has no choice but to comply with the request. Any motive, retaliatory or otherwise, becomes irrelevant. Therefore, the Trump Parties' First Amendment claim, like their other claims, fails.

### III.    Conclusion

The 2021 Request seeks information that may inform the United States House of Representatives Committee on Ways and Means as to the efficacy of the Presidential Audit Program, and therefore, was made in furtherance of a subject upon which legislation could be had. Further, the Request did not violate separation of powers principles under any of the potentially applicable tests primarily because the burden on the Executive Branch and the Trump Parties is relatively minor. Finally, § 6103(f)(1) is not facially unconstitutional because there are many circumstances under which it can be validly applied, and Treasury's decision to comply with the Request did not violate the Trump Parties' First Amendment rights. We affirm.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in part and concurring in the judgment: I concur in Parts I and II.A and the portions of Part II.B of the majority opinion analyzing the Trump Parties' constitutional challenge to 26 U.S.C. § 6103(f)(1) and their First Amendment claim. I agree with my colleagues that the Committee has stated a valid legislative purpose, § 6103(f)(1) is not facially unconstitutional and the Treasury Department's compliance with the 2021 Request does not violate the First Amendment. With respect to the majority's separation-of-powers analysis in Parts II.B.1, II.B.2 and III, I concur in the judgment only, as detailed *infra*.

Although I agree with my colleagues that the burdens imposed on the Presidency by the Committee's Request do not rise to the level of a separation-of-powers violation, I conclude that the burdens borne by the Executive Branch are more severe and warrant much closer scrutiny than my colleagues have given them. I write separately to highlight this shortcoming and to urge caution given the foundational constitutional principles at stake.

My colleagues correctly identify the four factors that the Supreme Court in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), instructed the court to consider when the Congress requests the President's personal papers or information.[1] *See* Majority Op. at 17–18 (citing *Mazars*, 140 S. Ct. at 2035–36). Under the fourth factor, the Supreme Court directs that "courts should be careful to assess the burdens imposed on the President by" the congressional request. *See Mazars*, 140 S. Ct.

---

[1] I focus on my colleagues' application of the Supreme Court's *Mazars* test because, as they rightly note, "it is likely law of the circuit that a congressional request for a sitting President's personal information is evaluated under the heightened *Mazars* standard regardless of whether the President in question remains in office." Majority Op. at 14 (citing *Trump v. Mazars USA, LLP*, --- F.4th ---, No. 21-5176, 2022 WL 2586480 (D.C. Cir. July 8, 2022)).

at 2036. The reason is self-evident: the burdens "should be carefully scrutinized" because "they stem from a *rival political branch* that has an ongoing relationship with the President and incentives to use" similar requests "*for institutional advantage.*" *Id.* (emphases added). In a brief paragraph, my colleagues dismiss what I view to be the most significant burden—that granting such a request "would empower a future Congress to threaten or influence the sitting President with invasive requests once he leaves office"—as merely "possible" and "not substantial."[2] Majority Op. at 24. I disagree and this analysis, in my view, falls short of the "careful[] scrutin[y]" required by *Mazars*. 140 S. Ct. at 2036.

To begin, the answer to the question of which burden should be examined, Majority Op. at 23 (asking whether "we look at the burden the Request places on former President Trump and the other Trump Parties, or . . . at the burden these requests place on the current President"), has been answered in *Mazars*. There, the Supreme Court repeatedly made clear that the focus of the inquiry is the burden imposed on the Office of the President as an independent and co-equal branch of government rather than the particular officeholder at the time the request is made or during the then-current phase of litigation. *See* 140 S. Ct. at 2036 (discussing "ongoing relationship" and potential for "institutional advantage" between rival political branches in context of burdens factor); *see also id.* at 2034 (noting that similar requests "unavoidably pit the political branches against one another"), 2036 (highlighting concerns about "intrusion[s] into the operation of the Office of the President" with respect to the second factor—

---

[2] I agree with my colleagues that the potential exposure of the Trump Parties' private financial information is not a burden that implicates the separation of powers. *See* Majority Op. at 24.

ensuring that request is "no broader than reasonably necessary to support Congress's legislative objective" (citation omitted)).

Next, the Congress's potential and incentive to threaten a sitting President with a post-Presidency § 6103(f)(1) request in order to influence the President while in office should not be dismissed so quickly. *See* Majority Op. at 24. The Supreme Court recognized this as a legitimate concern in *Mazars*. *See* 140 S. Ct. at 2034 ("[A] demand may aim to harass the President or render him 'complaisan[t] to the humors of the Legislature.'" (quoting THE FEDERALIST No. 71, at 483 (Alexander Hamilton) (J. Cooke ed. 1961) (second alteration in original)); *id.* (without limits on such inquiries "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared" (quoting THE FEDERALIST No. 71, at 484 (Alexander Hamilton))). We have recently done so as well. *Trump v. Mazars USA, LLP*, --- F.4th ---, ---, No. 21-5176, 2022 WL 2586480 at *8 (D.C. Cir. July 8, 2022) ("Congress could perhaps use the threat of a post-Presidency pile-on to try and influence the President's conduct while in office." (quoting *Trump v. Thompson*, 20 F.4th 10, 44 (D.C. Cir. 2021))). What's more, I do not believe this concern can be dismissed so casually as a mere possibility. *See* Majority Op. at 24. Indeed, it happened to President Trump in *Mazars*. *See* --- F.4th at ---, 2022 WL 2586480 at *8 ("[T]he Committee specifically made known, while President Trump remained in office, that the Committee 'fully intend[ed] to continue [its] investigation . . . in the next Congress, regardless of who holds the presidency.'" (alterations in original)). Although we cannot know the extent to which the requests and investigations influenced—or were intended to influence—President Trump's conduct while in office, it is not far-fetched to believe that such intrusive inquiries could have a chilling effect on a President's ability to

fulfill his obligations under the Constitution and effectively manage the Executive Branch.

Finally, I would place no significance on the fact that President Trump no longer holds the office or on the current Administration's statement "that it intends to comply with the Chairman's Request." Majority Op. at 23. This dispute pits the Executive Branch against the Legislative Branch as institutions, not current or former Presidents against the chairmen of various congressional committees. And "the interbranch conflict here does not vanish" simply because the current Administration says so, the political winds shift or different parties control one or the other rival branch. *Cf. Mazars*, 140 S. Ct. at 2034. The constitutional principle at stake is separation of powers, not separation of parties.[3]

As noted, the inquiry focuses on the burden imposed on the Office of the President, not merely the former or current occupant of that office. *See id.* at 2036. And here, given the very real potential for the Congress to threaten a sitting President with post-Presidency investigations, the burden on the Executive imposed by a § 6103(f)(1) request is more severe than the burden in *Mazars*. There, the Congress sought production of financial records from President Trump's

---

[3] Notably, as our court recently observed in another context, the Supreme Court has left open "the possibility that President Trump's ability to assert executive privilege may be unaffected by his status as a former President—even in the face of the sitting President's opposition." *Mazars*, --- F.4th at ---, 2022 WL 2586480 at *9; *see also Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (Kavanaugh, J., respecting denial of application for stay) (observing "former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his presidency, even if the current President does not support the privilege claim").

personal accounting firm. *Mazars*, --- F.4th at ---, 2022 WL 2586480 at \*1. The subpoena there did not necessarily impose a severe burden on the Executive Branch as an institution because the Executive had no role in retrieving, examining or preparing documents for disclosure. Here, by contrast, the Executive Branch—and the President as head of that branch—is necessarily involved in complying with the request as the Treasury Department and, specifically, the Internal Revenue Service must retrieve, examine and prepare the requested tax documents for disclosure.

My colleagues discuss none of this. And although their thorough analysis of the Committee's asserted legislative purpose, the breadth of the request and the evidence offered by the Committee to establish its legislative purpose, *see* Majority Op. at 19–23, may suggest that the burden on the Executive Branch may not be severe enough to violate the separation of powers, a more searching inquiry into the burdens imposed by the Committee's request is warranted given the core constitutional principle at issue.

Accordingly, I concur fully in Parts I and II.A, as well as in Part II.B's analysis of the Trump Parties' constitutional challenge and First Amendment claim. With respect to the separation-of-powers discussion in Parts II.B.1, II.B.2 and III, I concur in the judgment only.