# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Senator Jay Costa, Senator Anthony H. Williams, Senator Vincent J. Hughes, Senator Steven J. Santarsiero and Senate Democratic Caucus, | : : : : : : | **CASES CONSOLIDATED** |
| Petitioners | : : | |
| v. | : : | No. 310 M.D. 2021 Argued: September 12, 2022 |
| Senator Kim Ward and Senator Jarrett Coleman, | : : | |
| Respondents | : | |
| | | |
| Commonwealth of Pennsylvania, Pennsylvania Department of State, and Leigh M. Chapman, Acting Secretary of the Commonwealth of Pennsylvania, | : : : : : : | |
| Petitioners | : : | |
| v. | : : | No. 322 M.D. 2021 |
| Senator Jarrett Coleman, Senator Kim Ward and The Pennsylvania State Senate Intergovernmental Operations Committee, | : : : : | |
| Respondents | : | |
| | | |
| Arthur Haywood Julie Haywood, | : : | |
| Petitioners | : : | |
| v. | : : | No. 323 M.D. 2021 |
| Leigh M. Chapman Acting Secretary of State Commonwealth of Pennsylvania, | : : : | |
| Respondent | : | |

HONORABLE MICHAEL H. WOJCIK, Judge
        HONORABLE LORI A. DUMAS, Judge
        HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                    FILED:  February 9, 2023

Before the Court are the consolidated petitions for review filed by the Commonwealth of Pennsylvania, Department of State, and the Acting Secretary of the Commonwealth, Leigh M. Chapman[1] (collectively, Acting Secretary); Senators Jay Costa, Anthony H. Williams, Vincent J. Hughes, and Steven J. Santarsiero, and the Senate Democratic Caucus (collectively, Democratic Senators); and Arthur Haywood and Julie Haywood (collectively, the Haywoods) (collectively, Petitioners).[2]  Intervention was granted to the League of Women Voters of Pennsylvania, Common Cause Pennsylvania, Make the Road Pennsylvania, and eight registered voters (collectively, Voter Intervenors).  Petitioners and Voter Intervenors challenge a subpoena *duces tecum* issued on September 15, 2021, by the Pennsylvania State Senate Intergovernmental Operations Committee (Senate Committee or Committee) to the Acting Secretary of the Commonwealth, to produce copies of certain election-related documents and deliver them to the General Counsel of the Senate Republican Caucus.[3]  Petitioners and Voter Intervenors seek to enjoin the subpoena.  For the reasons that follow, we dismiss the petitions for review.

---

[1] At the time this matter was initiated, the Acting Secretary was Veronica Degraffenreid, and she was followed by Acting Secretary Leigh M. Chapman.

[2] The Haywoods filed their petition for review against the Acting Secretary.  However, they essentially seek to restrain enforcement of the legislative subpoena.

[3] After the 2023-2024 legislative session was convened, a praecipe to substitute certain senator parties was filed.  No party has requested dismissal of the consolidated petitions for review on grounds of mootness.

2

## Background

The Senate Committee's subpoena *duces tecum* seeks the production of 17 categories of election-related documents filed with and maintained by the Department of State. Included therein is a request for a list of all electors who voted in the November 2020 general election, by county, and the manner of their vote whether in person, by mail-in ballot, by absentee ballot, or by provisional ballot. The subpoena requests the same list, in the same format, for the May 2021 primary election. This requested information is contained in the Statewide Uniform Registry of Electors (SURE) system, 25 Pa. C.S. §1222[4] (as identified in what is known as the Pennsylvania Voter Registration Act, 25 Pa. C.S. §§701-3302). The subpoena requests a list of voter registration changes made in the SURE system between May 31, 2020, and May 31, 2021, and copies of the Department of State's audits of the SURE system between 2018 and 2021. Finally, the subpoena requests a copy of the certified results for the two elections.

Petitioners and Voter Intervenors seek to enjoin the subpoena because they believe it does not have a valid legislative purpose. They assert that the Senate Committee's true purpose is to challenge the outcome of the 2020 presidential election, which is a matter conferred exclusively upon the judiciary and governed by

---

[4] The SURE system is a single, uniform, integrated computer system that includes a database of all registered electors in the Commonwealth. To ensure the integrity and accuracy of all voter registration records, the SURE system assigns a unique registration number to each individual registered to vote in the Commonwealth; provides for the electronic transfer of completed voter registration applications and changes of address; permits the auditing of each registered elector's registration record; identifies the election district to which a qualified elector or registered elector should be assigned; produces reports as required; identifies duplicate voter registrations on a countywide and statewide basis; identifies registered electors who have been issued absentee ballots under the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2600-3591; and identifies registered electors who vote in an election and the method by which their ballots were cast. *See* 25 Pa. C.S. §1222(c).

3

the Election Code.[5]  Further, because the requested database includes voters' names, addresses, dates of birth, driver's license numbers, and the last four digits of their social security numbers, compliance with the subpoena may compromise the informational privacy rights of registered voters that are protected by the Pennsylvania Constitution.[6]

More specifically, the Acting Secretary's injunction petition asserts that the subpoena *duces tecum* is invalid and unenforceable because it:

i. Was not issued for a legitimate legislative purpose;
ii. Concerns matters outside the Committee's subject matter area;
iii. Was issued without probable cause to seek information in which Pennsylvanians have a reasonable expectation of privacy;
iv. Demands information protected by the deliberative process privilege; and
v. Is overbroad.

Acting Secretary's Petition for Review, Prayer for Relief at 74.  The Democratic Senators' injunction petition also asserts that the Senate Committee issued the subpoena to contest the 2020 general election or to do an election audit, either of which violates the separation of powers doctrine.[7]  Further, the requested voter

---

[5] Section 1758 of the Election Code, 25 P.S. §3458, provides that an election outcome can be contested by filing a petition with the court having jurisdiction over the matter.

[6] Article I, section 1 of the Pennsylvania Constitution states that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  PA. CONST. art. I, §1.  This provision creates a right to informational privacy.

[7] In regard to the concept of separation of powers, our Supreme Court recently stated:

In our Commonwealth, the roots of the separation of powers doctrine run deep.  The delineation of the three branches of government, each with distinct and independent powers, has been inherent in the structure of Pennsylvania's government since its genesis - the constitutional convention of 1776.  Indeed for most of our

information is protected from public disclosure by the voter's constitutional right of informational privacy. Also asserting a right to informational privacy, the Haywoods seek to enjoin the Acting Secretary from disclosing their voter registration information contained in the SURE system. Voter Intervenors support the above-listed injunction petitions on the theory that the subpoena request is overbroad, is not for a valid legislative purpose, and implicates the informational privacy rights of the individual Voter Intervenors and the members of the association intervenors.

Petitioners and Voter Intervenors filed applications for summary relief requesting an immediate and permanent injunction.[8] The Senate Committee responded with its own application for summary relief, asserting that the Pennsylvania Constitution permits the legislature to conduct an investigation that may aid legislators in determining whether, or in what manner, they should consider amendments to the Election Code. The Senate Committee asserted that the informational privacy rights of registered voters are not implicated when information in the possession of the executive branch is shared with another branch of the Commonwealth government, whether legislative or judicial.

In a memorandum opinion and order filed on January 10, 2022, this Court denied all the applications for summary relief because the parties did not

---

Commonwealth's history, our Court has vigorously maintained separation of the powers of the branches[.]

*Renner v. Court of Common Pleas of Lehigh County*, 234 A.3d 411, 420 (Pa. 2020) (internal citations omitted).

[8] Democratic Senators also filed a request for a preliminary injunction. However, that request was stayed by an agreement of the Senate Committee not to enforce the subpoena while the Court considered the injunction petitions and the applications for summary relief.

establish a clear right to the relief they sought.[9] *Costa v. Corman* (Pa. Cmwlth., No. 310 M.D. 2021, filed January 10, 2022); *Pennsylvania Department of State v. Dush* (Pa. Cmwlth., No. 322 M.D. 2021, filed January 10, 2022); *Haywood v. Chapman* (Pa. Cmwlth., No. 323 M.D. 2021, filed January 10, 2022) (cases consolidated).

Subsequent to the denial of summary relief, the Court directed the parties to address three questions: (1) whether the petitions for review were ripe for review; (2) whether the availability of an adequate remedy at law precludes the Court's exercise of equity jurisdiction over a challenge to a legislative subpoena; and (3) whether the General Assembly's constitutional enforcement power or the criminal contempt statute precludes the Court's exercise of equity jurisdiction. Court Order, 1/25/2022. Briefs were filed by all parties.

In her brief, the Acting Secretary argues that the matter is ripe for review because an actual controversy was created by the mere issuance of the subpoena *duces tecum*. The General Assembly's enforcement power exposes the Acting Secretary to arrest, detention, and criminal sanctions should this Court not exercise its equity jurisdiction. Democratic Senators, the Haywoods, and Voter Intervenors echo these arguments. Applying principles developed under the Right-to-Know Law,[10] they argue that the Acting Secretary cannot disclose the voters' driver license numbers and last four digits of their social security numbers to a third party without balancing the private informational interest against the public interest in disclosure. *See Pennsylvania State Education Association v. Commonwealth Department of Community and Economic Development*, 148 A.3d 142, 158 (Pa.

---

[9] However, the Court granted the cross-application for summary relief filed by the Senate Secretary-Parliamentarian Megan Martin. The Court agreed that the Democratic Senators did not state a claim against her, and, thus, she was dismissed as a named respondent.

[10] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

2016) (*PSEA*) (holding that "[t]he right to informational privacy is guaranteed by [a]rticle I, [s]ection 1 of the Pennsylvania Constitution, and may not be violated unless outweighed by a public interest favoring disclosure"). Until the Senate Committee explains how the voter database information relates to potential legislation, the Acting Secretary cannot do this balancing of public and private interests, as she must before disclosing this information to a third party, *i.e.*, the Senate Committee. Democratic Senators, the Haywoods, and Voter Intervenors observe that the Senate Committee's enforcement of the subpoena may provide the Acting Secretary a proceeding in which to raise her constitutional objections to the subpoena; however, because they have not been issued a subpoena, they are not guaranteed the opportunity to challenge the subpoena.

The Senate Committee responds that the legislature is not a third party, as suggested by the Acting Secretary. The General Assembly is the Commonwealth of Pennsylvania, as is the Secretary of the Commonwealth.[11] The subpoena *duces*

---

[11] As we have explained, the "Commonwealth is a single entity that has organized itself into agencies and instrumentalities to perform specific functions." *Gillen v. Workers' Compensation Appeal Board (Pennsylvania Turnpike Commission)*, 253 A.3d 362, 370 (Pa. Cmwlth. 2021). In *Lyness v. State Board of Medicine*, 605 A.2d 1204, 1209 (Pa. 1992), the Supreme Court noted that "each administrative board and judge is ultimately a subdivision of a single entity, the Commonwealth of Pennsylvania." The Acting Secretary offers no authority for her position that the Department of State cannot share records it is required by statute to maintain with the legislative branch of a single entity, the Commonwealth of Pennsylvania, or that this sharing constitutes "public" disclosure or implicates informational privacy. *See also J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) (noting that "our Federal Constitution and state Constitutions of this country divide the governmental power into three branches . . . [which are] coordinate parts of one government . . . .").

Voter Intervenors observe that in *Chester Housing Authority v. Polaha*, 173 A.3d 1240 (Pa. Cmwlth. 2017), informational privacy was implicated where a township requested a list of voucher recipients from the housing authority. This case is inapposite because it does not address two branches of one government. Rather, a housing authority and a township are separate entities, each created by the legislature in a separate enactment.

*tecum* was issued under the express authority of the Pennsylvania Constitution and, as such, bears no relation to a citizen request for information presented to the Department of State under authority of a statute, *i.e.*, the Right-to-Know Law. The Senate Committee also questions the sincerity of the informational privacy claim, noting that one of the Voter Intervenors, the League of Women Voters, subpoenaed this very same voter registration information in its challenge to the voter identification law on grounds that the statute would suppress the exercise of the franchise. *See Applewhite v. Commonwealth*, 54 A.3d 1 (Pa. 2012). In that litigation, this Court directed the Department of State to provide this voter information in discovery so that the League of Women Voters' consultant could prepare an expert report for use in the litigation. *Applewhite v. Commonwealth* (Pa. Cmwlth., No. 330 M.D. 2012, filed April 29, 2013) (Simpson, J., single-judge order) (directing the Department of State to disclose the names, addresses, partial Social Security numbers, and driver's license and non-driver's identification numbers, of all voters in the SURE system, along with information from the Pennsylvania Department of Transportation's database that included date of birth, current address, county code, sex, and prior name and address).

Nevertheless, the Senate Committee asserts that this Court need not address the merits of the constitutional arguments raised by Petitioners and Voter Intervenors at this juncture. There has been no "confrontation," which is required in order to have an actual controversy ripe for judicial review. When, and if, the Senate Committee takes action to enforce its subpoena in accordance with its constitutional enforcement power, the Acting Secretary then may raise any and all of her legal and constitutional claims. The civil and criminal contempt statutes also provide legal remedies that preclude this Court from exercising equity jurisdiction.

8

On September 12, 2022, Petitioners, Voter Intervenors, and the Senate Committee presented oral argument on the questions raised by this Court's January 25, 2022, order. Oral argument was heard seriately with *Pennsylvania Senate Intergovernmental Operations Committee v. Pennsylvania Department of State*, __ A.3d __ (Pa. Cmwlth., No. 95 M.D. 2022, filed February 9, 2023).

## Legislative Subpoena Power

We begin with a review of the principles that govern a legislative subpoena. This includes a review of the circumstances where the judiciary has become involved in the enforcement of a legislative subpoena.

"The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, §1. "Each House shall have power to determine the rules of its proceedings and . . . to enforce obedience to its process . . . and shall have all other powers necessary for the Legislature of a free State." *Id*. §11.[12]

Among the powers "necessary for the Legislature" is the power to conduct investigations. PA. CONST. art. II, §11. Our Supreme Court has explained that the legislature's "power to investigate is an essential corollary of the power to legislate" and that "[t]he scope of this power of inquiry extends to every proper

---

[12] It reads, in its entirety:

> Each House shall have power to determine the rules of its proceedings and punish its members or other persons for contempt or disorderly behavior in its presence, to enforce obedience to its process, to protect its members against violence or offers of bribes or private solicitation, and, with the concurrence of two-thirds, to expel a member, but not a second time for the same cause, and shall have all other powers necessary for the Legislature of a free State. A member expelled for corruption shall not thereafter be eligible to either House, and punishment for contempt or disorderly behavior shall not bar an indictment for the same offense.

PA. CONST. art. II, §11.

subject of legislative action." *Commonwealth ex rel. Carcaci v. Brandamore*, 327 A.2d 1, 3 (Pa. 1974) (*Brandamore*). "It is well established that a function of legislative committees is to find facts and to make recommendations to the legislature for remedial legislation and other appropriate action." *Lunderstadt v. Pennsylvania House of Representatives Select Committee*, 519 A.2d 408, 410 (Pa. 1986) (plurality opinion). As our Supreme Court has explained:

> The right to investigate in order to acquire factual knowledge concerning particular subjects which will, or may, aid the legislators in their efforts to determine if, or in what manner, they should exercise their powers, is an inherent right of a legislative body, ancillary to, but distinct from, such powers.

*McGinley v. Scott*, 164 A.2d 424, 429 (Pa. 1960). Nevertheless, there are limits to the legislature's investigations, lest the legislature impermissibly encroach upon a citizen's individual freedoms.

In *Brandamore*, 327 A.2d 1, our Supreme Court considered the appeal of Angelo J. Carcaci, a lieutenant in the Pennsylvania State Police who refused to answer questions put to him by a special committee of the House of Representatives investigating law enforcement agencies in the Commonwealth. The Supreme Court upheld Carcaci's conviction for contempt and his commitment until expiration of the legislative session unless "he should sooner purge himself by testifying before the committee." *Id*. at 2. Accordingly, it affirmed the dismissal of Carcaci's petition for a writ of habeas corpus. Finally, the Court rejected Carcaci's claim that the subpoena lacked a legislative purpose. After examining the House resolution authorizing the investigation, the Supreme Court concluded that "[l]aw enforcement and the administration of justice are public functions" and "proper subjects for legislative action." *Id*. at 4. It also rejected Carcaci's challenge to his conviction for

10

contempt of the House of Representatives, concluding that it fully comported with due process.

In *obiter dictum*, the Supreme Court acknowledged that the legislature's broad investigatory powers are subject to "limitations placed by the Constitution on governmental encroachments on individual freedom and privacy." *Brandamore*, 327 A.2d at 4. With regard to that limitation, the Supreme Court explained that there must be a "balance between the protection of the rights of the individual and the avoiding of unnecessary restraint upon the State in the performance of its legitimate governmental purposes." *Id.* (quoting *In re Pennsylvania Crime Commission*, 309 A.2d 401, 407 (Pa. 1973)).

For this balancing test, our Supreme Court drew upon the United States Supreme Court's holding in *Barenblatt v. United States*, 360 U.S. 109 (1959), which reviewed Barenblatt's contempt conviction for refusing to answer questions about his participation in Communist Party activities. The United States Supreme Court acknowledged that where "First Amendment rights are asserted to bar governmental interrogation, resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." *Id.* at 126. The United States Supreme Court concluded that because the investigation related to a valid legislative purpose, the witness could be required to disclose his political and private relationships. It rejected Barenblatt's contention that "the true objective of the [c]ommittee" was "exposure," not legislation, explaining that "the [j]udiciary lacks authority to intervene on the basis of the motives which spurred the exercise of the power." *Id.* at 132.[13] The remedy for "a

---

[13] *See also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("In determining the legitimacy of congressional [subpoena], we do not look to the motives alleged to have prompted it."); *Committee on Ways and Means, United States House of Representatives v.*

wrong motive or purpose" lies "not in the abuse by the judicial authority of its functions, but in the people[.]" *Id*. at 132-33. The United States Supreme Court upheld Barenblatt's conviction for contempt of Congress.

To be sure, a subpoena can be restrained where it seeks to "investigate the personal affairs" of the subpoena's recipient without advancing a legislative purpose. *Annenberg v. Roberts*, 2 A.2d 612, 617 (Pa. 1938). In *Annenberg*, the subpoena in question was found to effect a warrantless search and seizure in violation of the Fourth Amendment.[14] As such, the commission had unlawfully set itself up "as a court or grand jury." *Id*.

The controversy had its origins in the governor's convening of a special session of the General Assembly to consider "[m]aking illegal the use of devices or methods of transmission of information or advices in furtherance of gambling." *Id*. at 614. The special session enacted the Act of October 11, 1938, P.L. 77, No. 27 (Act 27), which set up a six-person commission to investigate and make recommendations for improvements in the criminal gambling laws. The statute gave the commission the power to issue subpoenas and provided for penalties as "provided by the laws of this Commonwealth in such cases," without specifying those laws. *Annenberg*, 2 A.2d at 615.

---

*United States Department of Treasury*, 45 F.4th 324, 333 (D.C. 2022) (*Committee on Ways and Means*) ("The mere fact that individual members of Congress may have political motivations as well as legislative ones is of no moment.")

[14] The Fourth Amendment to the United States Constitution provides that

the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The plaintiff, John Annenberg, filed a bill of equity in the Court of Common Pleas of Dauphin County to challenge the constitutionality of Act 27 and to restrain the subpoena directing him to produce

> "*all records, including* contracts, stock certificates, agreements of trust, agreements of partnership, ledgers, journals, check-books, *cancelled checks, bank deposit books, pass books, accounts,* evidence of ownership, and memoranda, including letters, telegrams, messages and memoranda received from, and copies of letters, telegrams, messages and memoranda sent to" thirty-eight named individuals, "*showing [his] connection with or interest in*, either directly or indirectly, *any or all companies, holding companies, corporations, partnerships or associations, directly or indirectly, engaged in or having to do with the dissemination of sporting news in all forms and by any means, including horse racing results distributed in the State of Pennsylvania or elsewhere in the United States [or] Canada*, newspapers, racing sheets, dope sheets, form sheets, racing records and statistics, and particularly with respect to the following corporations or companies," naming fifty-two corporations.

*Annenberg*, 2 A.2d at 617 (quoting subpoena) (emphasis added). Annenberg argued that the commission's investigation into his personal financial affairs could be done only pursuant to a court-approved search warrant, after a showing of probable cause, or by a grand jury. Our Supreme Court agreed:

> It would seem scarcely necessary to marshal authorities to establish, as a proposition of constitutional law, that *a witness cannot be compelled, under the guise of a legislative study of conditions bearing upon proposed legislation, to reveal his private and personal affairs, except to the extent to which such disclosure is reasonably required for the general purpose* of the inquiry. To compel an individual to produce evidence, under penalties if he refuses, is in effect a search and seizure, and, unless confined to proper limits, violates his constitutional right to immunity in that regard.

13

*Id.* (emphasis added).

The Supreme Court rejected Annenberg's various challenges to the constitutionality of Act 27. However, it held that the subpoena's demands for production of documents violated Annenberg's rights under the United States and Pennsylvania Constitutions. *Annenberg*, 2 A.2d at 619. Citing precedent from other state appellate courts and the United States Supreme Court, our Supreme Court explained that individuals are entitled to protection "in the enjoyment of life, liberty and property and from *inquisitions into private affairs*." *Id.* at 618 (quoting *Attorney General v. Brissenden*, 171 N.E. 82, 86 (Mass. 1930)) (emphasis added). The information requested of Annenberg was found irrelevant to the "matters properly being inquired into by the commission." *Annenberg*, 2 A.2d at 618. Instead, the court found that "[t]he subpoenas show *on their face* that they contemplate an unreasonable search and seizure." *Id.* (emphasis added).[15] Because the subpoena *duces tecum* sought to do the work of a grand jury, it lacked a valid legislative purpose. *Id.*

*Annenberg* concerned a subpoena authorized by statute. However, in *Lunderstadt*, 519 A.2d at 413, our Supreme Court applied the *Annenberg* principles to a legislative subpoena issued under authority of the Pennsylvania Constitution because of the importance of "an individual's interest in maintaining privacy, under

---

[15] In *Commonwealth v. Costello*, 21 Pa. D. 232 (1912), the Court of Quarter Sessions of the Peace of Pennsylvania in Philadelphia County dismissed the criminal indictment against an individual who refused to testify before a Senate committee. "Although the action of the Senate must be presumed to have had a legitimate object, *if it is capable of being so construed, and the court has no right to assume that the contrary was intended*, . . . its resolution, in our opinion, bears on its face plain indications that when it was adopted the Senate had no proper legislative purpose in view." *Id.* at 234-35 (citation omitted). The court concluded that the Senate had established itself as an extraordinary tribunal to exercise a judicial function. Further, the committee could not act after the legislature had adjourned *sine die*. *Id.* at 237.

14

the Fourth Amendment and under article I, section 8 of the Pennsylvania Constitution[.]"[16]  The Supreme Court warned:

> [T]hat legislative investigations may, through *inquisitions into private affairs*, assume a character that is of questionable relevance to legitimate legislative purposes . . . .  Indeed, in their proper realm, legislative committees are not to set themselves up as courts or as grand juries rather than as entities intended to investigate and report on conditions for the information of members of the legislature.

*Lunderstadt*, 519 A.2d at 413 (emphasis added).  Where the legislature intrudes on "one's private affairs," a subpoena cannot issue "except upon a showing of probable cause that the particular records sought contain evidence of civil or criminal wrongdoing."  *Id*. at 414-15.  The Supreme Court reversed this Court's refusal to quash the subpoena to Carl Lunderstadt, a consultant for the Capitol addition project, to produce five years of his checking account and personal financial records and those of his family members.  The concurring opinion of Justice Hutchinson would have quashed the subpoena on another ground:

> *This resolution does not contain even a hint that the investigation seeks to determine whether and what new law is needed to correct abuses in state construction contracts*.  The function of this investigating committee is limited to checking compliance with existing law.  That function is reserved to prosecutors, police and grand juries.

*Id*. at 416 (Hutchinson, J., concurring) (emphasis added).

---

[16] Article I, section 8 of the Pennsylvania Constitution provides that "the people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, not, without probable cause, supported by oath or affirmation subscribed to by the affiant."  PA. CONST. art. I, §8.

15

In sum, neither a legislative committee nor a commission established by statute may set itself up as a grand jury or assume the function of a prosecutor. *Annenberg*, 2 A.2d at 617. Any "inquisition" into private affairs will be presumed to have a "questionable" legislative purpose. *Lunderstadt*, 519 A.2d at 413.

With these principles in mind, we turn to the question of whether the Court should exercise its equity jurisdiction to intervene in the Senate Committee's subpoena for documents held by the Department of State at this juncture.

**Analysis**

**I.**

The first question raised by this Court's order of January 25, 2022, was whether the legislative subpoena is ripe for this Court's review.

"Ripeness has been defined as the presence of an actual controversy; it requires a court to evaluate the fitness of the issues for judicial determination, as well as the hardship to the parties of withholding court consideration." *Borough of Centralia v. Commonwealth*, 658 A.2d 840, 842 (Pa. Cmwlth. 1995). "Court rulings applying the ripeness doctrine are premised on policies of sound jurisprudence; courts should not give answers to academic questions, render advisory opinions, or make decisions based on assertions of hypothetical events that might occur in the future." *Philips Brothers Electrical Contractors, Inc. v. Pennsylvania Turnpike Commission*, 960 A.2d 941, 945 (Pa. Cmwlth. 2008).[17] To determine whether a matter is ripe, the Supreme Court has instructed as follows:

---

[17] In *Philips Brothers*, a prospective bidder petitioned for this Court's review of the Turnpike Commission's dismissal of its bid protest, which was filed one year prior to the Commission's solicitation of bids on a proposed turnpike facility. This Court affirmed the Turnpike Commission. We held that the prospective bidder could pursue a bid protest in accordance with the timetable set forth in the Commonwealth Procurement Code, 62 Pa. C.S. §§101-2311, when and if it chooses to do so. *Philips Brothers*, 960 A.2d at 946.

16

The factors we consider under our "adequately developed" inquiry include: whether the claim involves *uncertain and contingent events that may not occur as anticipated or at all*; the amount of fact finding required to resolve the issue; and whether the parties to the action are sufficiently adverse.

*Township of Derry v. Pennsylvania Department of Labor and Industry*, 932 A.2d 56, 58 (Pa. 2007) (internal quotation omitted) (emphasis added).

In *Department of Environmental Resources v. Marra*, 594 A.2d 646 (Pa. 1991), a landowner sought to restrain enforcement of this Court's injunction that required him to disclose the location of certain paint solvents and waste removed from his property, on grounds that the order violated his Fifth Amendment right against self-incrimination.[18]  The Supreme Court held that the matter was not ripe for review, explaining as follows:

> *In the present case, the Commonwealth has not sought to enforce its injunction*, the lower court has not yet had an opportunity to hear appellant's Fifth Amendment claim, and appellant herein does not risk the imposition of greater sanctions by awaiting the enforcement proceeding. *It is possible that such proceedings will never be initiated.*

*Id*. at 648 (emphasis added).

In *Camiel v. Select Committee on State Contract Practices of House of Representatives*, 324 A.2d 862 (Pa. Cmwlth. 1974), this Court was presented with a request to quash a legislative subpoena on constitutional grounds.  In an *en banc* decision, we held that the mere issuance of a legislative subpoena does not create a controversy that was ripe for review.

---

[18] The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. CONST. amend. V.

In *Camiel*, the Pennsylvania House of Representatives, by resolution, formed a select committee to

> examine, investigate and make a complete study for the purpose of informing the House of Representatives in the discharge of its constitutional legislative functions and duties of any and all matters pertaining to: (1) the administration, activities, methods of operations, use of appropriations, use of funds and expenditures thereof, policies, accomplishments and results, deficiencies or failures, eff(i)ciency and effectiveness of State agencies responsible for the purchasing, leasing, contracting, and disposal of Commonwealth supplies, properties and services; and (2) individuals, corporations, consultants, advisors, authorities and entities within or outside the Commonwealth, related to, involved in, or affecting the purchasing, leasing, construction and disposal of Commonwealth property, supplies and services[.]

*Id.* at 864. The select committee issued a subpoena *duces tecum* to the custodians of records for the Republican and Democratic county committees of 12 counties in the Commonwealth. The subpoena issued to Peter J. Camiel, the Chairman of the Democratic County Executive Committee of Philadelphia County, sought

> *books, documents, accounts, records, indices, tapes, logs, ledgers, and any and all other data pertaining to*: (a) *all contributions* received on or after January 1, 1966 through May 13, 1974, including but not limited to, any monies, goods, services, or any other thing or things of value by the Democratic County Executive Committee of Phila[delphia] County or any other committee, group, or person operating under the authority of the aforementioned committee; [and] (b) the name and address of each of said contributors. The date, amount, and method of payment (cash, check, money order, etc.)[.]

*Id.* at 864-65 (emphasis added). Camiel filed a petition for review to restrain the subpoena.

Camiel's petition asserted that the request was so broad and indefinite that it violated his constitutional rights. Quoting *Barenblatt*, 360 U.S. at 111-12, we acknowledged that "[b]road as it is, the power (to investigate) is not, however, without limitations . . . more particularly [] the relevant limitations in the Bill of Rights." *Camiel*, 324 A.2d at 868. We further acknowledged that "Camiel has raised real issues which may some day have to be decided by the courts[;]" however, we concluded "that this case does not yet present a justiciable issue and therefore is not ripe for a decision on the merits." *Id.* at 865. Accordingly, we dismissed the petition for review.

In so holding, we began with separation of powers, explaining as follows:

> We view this point to be of a very serious nature. If there is any one principle of constitutional law which supports and protects our form of government, including all of our constitutional rights, it is the separation of powers among the three branches of government. Every crack in this foundation weakens the entire structure.

*Camiel*, 324 A.2d at 866. We distinguished a legislative subpoena from a subpoena issued by a "commission, *i.e.*, a separate entity," which acts "under specific statutory authority." *Id.* By contrast, in *Camiel*:

> *We are asked here to interfere with the legislative process*, and we believe we must question whether we have the jurisdiction and the power to interfere at this point in the proceedings.

*Id.* (emphasis added). The "point in the proceedings" considered in *Camiel* was the service of the legislative subpoena. However, notwithstanding the service of a "subpoena *duces tecum* upon Camiel, [] *there has been no confrontation.*" *Id.* (emphasis added).

19

We reasoned that a citizen must be able to raise constitutional defenses at the "point in the proceedings when his or her constitutional rights are affected[.]" *Id*. at 870. However, "[c]ourts should not decide a citizen's constitutional rights in a vacuum." *Id*. This is because

> *we do not know whether the Select Committee will force an issue*, for that is certainly within its discretion. Absent a confrontation and a record made showing the factual posture of the matter, it is our position that it is *improper for this Court to dispose of all the potential constitutional issues which might be raised*[.]

*Id*. at 866 (emphasis added). In short, this Court will not decide issues raised by a legislative subpoena that are capable of being resolved by negotiation and compromise or change of heart.

In *Trump v. Mazars USA, LLP,* __ U.S. __, __, 140 S. Ct. 2019, 2030 (2020), the United States Supreme Court observed that historically "congressional demands for the President's information have been resolved by the political branches without involving this Court." These disputes are "hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Id.* at __, 140 S. Ct. at 2029. (citation omitted). For example, when a House subcommittee of the Congress subpoenaed documents from the Department of the Interior, President Ronald Reagan directed these documents to be withheld because they involved confidential presidential communications with subordinates. After the subcommittee voted to hold the Secretary of the Interior in contempt, "an innovative compromise soon followed." *Id*. at __, 140 S. Ct. at 2030. It is this "tradition of negotiation and compromise without the involvement of [the] court," *id*., that largely informed our Court's decision in *Camiel*, 324 A.2d at 866.

In dismissing Camiel's petition, our Court acknowledged the holding in *Annenberg*, 2 A.2d at 618, noting that "a court sitting in equity *may* restrain public

20

officers to protect a citizen's constitutional rights after service of a subpoena and before a confrontation[.]" *Camiel*, 324 A.2d at 866 (emphasis added). However, we found *Annenberg* distinguishable. First, *Annenberg* involved a subpoena issued by a "commission, *i.e.*, a separate entity," not by the legislature. *Camiel*, 324 A.2d at 866. Second, *Annenberg* raised a search and seizure of a citizen's private financial records, which was not raised in *Camiel*.

Federal case law also favors judicial restraint when faced with a challenge to a Congressional subpoena before confrontation. In *In re Motions to Quash Subpoenas and Vacate Service*, 146 F. Supp. 792 (W.D. Pa. 1956), a subpoena *duces tecum* was issued to Bessie Steinberg and Allan McNeil to testify about their activities to end sedition laws. They filed a motion to quash the subpoenas, and the District Court denied relief, despite the contention that the subpoenas violated their right of free speech and association.[19] In denying the requested relief, the District Court stated:

> We would be naive indeed if we did not recognize the difference of opinion regarding the subversive investigations of the last few years. That *Congress has the duty to consider remedial legislation in order to best effectuate our defenses against subversion* is only to state the obvious. That *Congress and the courts should be ever vigilant to protect our individual rights is no less clear*.
>
> * * *
>
> *Here the petitioners are asking for protection against some danger as yet unknown*. They claim a constitutional impairment not now clear. They presume a limitation of their constitutional privileges not yet threatened. *For us to presume that the House*

---

[19] U.S. CONST. amend. I. It states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Id.*

*of Representatives, the body most susceptible to the will of the people, will be less sensitive to the constitutional rights of the citizen than will be this Court* would authorize a presumption I am not prepared to accept. This would not be exercising a judicial prerogative or a judicial restraint, but *would in truth be judicial arrogance*[.]

*Id.* at 795 (emphasis added). The District Court concluded that this request for relief was premature.

We conclude that, as in *Camiel*, this matter is not ripe for this Court's review because there has been no confrontation. Likewise, the *Annenberg* circumstances do not pertain because that case concerned a subpoena issued under authority of statute and, thus, did not implicate "interference" with "legislative process." *Camiel*, 324 A.2d at 866.[20] The Senate Committee has not taken any steps to enforce its subpoena *duces tecum* under article II, section 11 of the Pennsylvania Constitution  or to hold the Acting Secretary in contempt. *See Marra*, 594 A.2d at 648. As the United States District Court aptly observed in *In re Motions to Quash Subpoenas and Vacate Service*, 146 F. Supp. at 795, "the petitioners are asking for protection against some danger as yet unknown."

## II.

Relying principally on *Annenberg*, 2 A.2d 612, the Acting Secretary asserts that this Court should exercise its jurisdiction in equity to restrain the Senate Committee's subpoena *duces tecum*. Democratic Senators, the Haywoods, and Voter Intervenors agree, noting also that they have no other vehicle for advancing their informational privacy claims. The Senate Committee rejoins that the existence

---

[20] The *Annenberg* subpoena was issued under authority of a statute by an entity created by statute, and the *Annenberg* subpoena effected an "inquisition" into "the private affairs" of the subpoena's recipient. By contrast, the Senate Committee's subpoena has nothing to do with the Acting Secretary's private affairs, and it was issued under authority of the Pennsylvania Constitution.

22

of a remedy at law precludes equity jurisdiction. Further, the "manner in which a legislative body exercises its inherent power to vindicate its authority and processes must satisfy the requirements of procedural due process." *Brandamore*, 327 A.2d at 5. In short, the existence of a legislative process for the enforcement of the Senate Committee's enforcement of its subpoena precludes this Court's exercise of equity jurisdiction.[21]

There is a difference between subject matter jurisdiction and equity jurisdiction, as this Court has explained:

> Jurisdiction is the power of a court to enter into an inquiry on a certain matter . . . . A careful distinction must be made between subject matter jurisdiction, which we have just defined, and equity jurisdiction, which describes the remedies available in equity . . . .
>
> Hence, *if there is an adequate non-statutory remedy at law, equity may withhold its remedies* and the matter will be transferred to the law side[.]

*Lashe v. Northern York County School District*, 417 A.2d 260, 262 (Pa. Cmwlth. 1980) (citations omitted) (emphasis added). Equity is discretionary with the court and should be exercised only "where the facts clearly establish the plaintiff's right thereto; where no adequate remedy at law exists; *and where the chancellor believes that justice requires it*." *Payne v. Clark*, 187 A.2d 769, 771 (Pa. 1963) (emphasis added). "In other words, *such a decree is of grace and not of right*." *Id*. (emphasis added).

---

[21] On March 11, 2022, the Senate Committee filed a petition for review in the nature of a complaint in mandamus, which, alternatively, sought this Court's enforcement of the Senate Committee's subpoena. That petition was argued before us, seriately with the present matter, on September 12, 2022, and is addressed in a separate opinion and order at *Pennsylvania Senate Intergovernmental Operations Committee*, __ A.3d at __, slip op. at 1-20.

In *Brown v. Brancato*, 184 A. 89, 91 (Pa. 1936), our Supreme Court held that there was "no doubt of the jurisdiction in equity to entertain the bill" brought by the directors of charitable trusts in the City of Philadelphia to challenge a proposed investigation by a committee of the House of Representatives. The Court explained that

> plaintiffs aver that defendants propose, by subpoena *duces tecum* to require production of the records, books, accounts, and other documents of plaintiff directors, *to the general disorganization of their trust administration*. Various prayers for restraint were made. The order dismissing the bill, made by the learned court below, cannot be sustained.

*Id*. (emphasis added). There were two reasons for the Supreme Court's decision to grant relief in equity to the directors of the Philadelphia charitable trusts.

First, the subject of the bill in equity was charitable trusts. The Supreme Court explained that "[f]rom the earliest days chancery has exercised jurisdiction over charitable trusts . . . . Chancery powers over trusts were exercised in this [C]ommonwealth 'as part of our own common law' prior to the [Act of June 16, 1836,] P.L. 784[, repealed by the Act of April 28, 1978, P.L. 202]." *Brown*, 184 A. at 91 (citations omitted). The directors of the Philadelphia charitable trusts had the fiduciary responsibility to preserve trust property with a value of $93 million. The records and accounts sought to be delivered to the House Committee would create "general disorganization of their trust administration." *Id*. The Supreme Court held that the directors were "not to be molested" in the exercise of their fiduciary responsibilities. *Id*. at 92.

Second, the House Committee's power to act ended when the legislature adjourned *sine die* on June 21, 1935. The legislative action that triggered the bill in equity occurred after that date. The Supreme Court observed that it was

24

doubtful that the House Committee could act under a resolution that was never submitted to the Senate. But even if it could, "after the adjournment, the power of the House complained of in this suit was done once and for all." *Brown*, 184 A. at 93. For that reason, the Supreme Court held that the House Committee was "without lawful authority in the premises." *Id*. at 92. The Supreme Court remitted the matter to the trial court with instructions to issue the injunction.

The Acting Secretary argues that because the Senate Committee has "the power to issue a warrant for the [Acting] Secretary's arrest and detention in Dauphin County prison," this Court must exercise equity jurisdiction. Acting Secretary Brief at 15-16. She argues that "a party need not wait to be subject to contempt proceedings before seeking judicial review." *Id*. at 15, 17. Further, the Senate Committee has refused to narrow or withdraw its subpoena but, rather, has noted its authority to enforce a subpoena "without recourse to the judiciary." *Id*. at 12. Stated otherwise, the Acting Secretary believes that the Committee's possible enforcement of the subpoena warrants judicial intervention in equity and in advance of confrontation. We are not persuaded.

The Pennsylvania Constitution vests the legislature with the power to enforce its subpoenas. PA. CONST. art. II, §11. The mere existence of this constitutional enforcement power does not warrant judicial intervention. Rather, separation of powers requires that the "legislative process" be respected by the judiciary. *Camiel*, 324 A.2d at 865.

Further, due process does not require that a "finding of contempt must be made in a judicial forum." *Brandamore*, 327 A.2d at 4. To the contrary,

> [t]he power of the Houses of the General Assembly to vindicate their authority and processes by punishing acts of contempt committed in their presence *is inherent in the legislative function*.

25

*Id*. (emphasis added). In *Brandamore*, our Supreme Court concluded that the House of Representatives had properly followed the procedures in Section 1 of the Act of June 13, 1842, P.L. 491, 46 P.S. §61, in holding Carcaci in contempt. To be sure, "the manner in which a legislative body exercises its inherent power to vindicate its authority and processes must satisfy the requirements of procedural due process." *Brandamore*, 327 A.2d at 5. The Supreme Court concluded Carcaci received the process he was due from the House of Representatives.

In short, in the event the Acting Secretary chooses not to produce the voter registration information and in the event the Senate Committee chooses to exercise its constitutional enforcement powers, the Acting Secretary will be able to raise constitutional arguments in a proceeding that must provide due process. *Brandamore*, 327 A.2d at 5. That proceeding could be brought under the legislature's constitutional enforcement powers, in accordance with the contempt statutes. *See* 46 P.S. §61; 18 Pa. C.S. §5110.[22]

The dissent argues that there is an "interbranch conflict" presented in this case that supports judicial intervention before confrontation. It believes that any legislative subpoena issued to an executive branch agency should be reviewed by the judiciary, using the principles announced in *Mazars*, __ U.S. __, 140 S. Ct. 2019.

*Mazars* involved four House subpoenas seeking personal financial information from President Donald J. Trump and his children and affiliated businesses, including his accounting firm, Mazars USA, LLP. The United States Supreme Court concluded that this intrusion into the "personal affairs" of a sitting

---

[22] "A person is guilty of a misdemeanor of the third degree if he is disorderly or contemptuous in the presence of either branch of the General Assembly, or if he neglects or refuses to appear in the presence of either of such branches after having been duly served with a subpoena to so appear." 18 Pa. C.S. §5110.

President required limits. *Cf. Annenberg*, 2 A.2d 612; *Lunderstadt*, 519 A.2d 408. Under these limits, courts must do a careful assessment of (1) whether the subpoena's "legislative purpose warrants the significant step of involving the President and his papers;" (2) whether the subpoena is "no broader than necessary to support Congress' legislative objective;" (3) whether the subpoena for the President's information clearly "advances a valid legislative purpose;" and (4) the extent of "the burdens imposed on the President by a subpoena." *Mazars*, __ U.S. at __, 140 S. Ct. at 2035-36. *Mazars* is inapposite.

First, "the *Mazars* test was created with a sitting President in mind." *Committee on Ways and Means*, 45 F.4th at 335 (applying *Mazars* test to a request of committee chairman for tax returns of President Donald J. Trump submitted under authority of a Federal statute and authorizing the release of the tax returns to Congress). *Mazars* addressed the potential for an "unnecessary intrusion into the operation of the Office of the President," *Mazars*, __ U.S. at __, 140 S. Ct. at 2036, caused by subpoenas seeking over a decade of personal financial information from a period of time that predated his presidency. It was the burden of production that created the "interbranch conflict," which was particular to the President, who "is the only person *who alone composes a branch of government*." *Id.* at __, 140 S. Ct. at 2034 (emphasis added).

Second, *Mazars* acknowledged, throughout, that the courts "have a duty of care that we not needlessly disturb the compromises and working arrangements" of the two political branches. *Id.* at __, 140 S. Ct. at 2031. The principle of separation of powers requires the courts to show the "respect due the coordinate branches of government." *Baker v. Carr*, 369 U.S. 186, 217 (1962). It was this

27

same concern that led our Court in *Camiel* to conclude that it should not become involved prematurely in the enforcement of a legislative subpoena.

Third, *Mazars*' four-part test does not fit the Senate Committee's subpoena. This subpoena does not seek personal financial information from the President (or even the Governor), let alone present a request so broad in scope that mere compliance interferes with "the operation of the Office of the President." *Mazars*, __ U.S. at __, 140 S. Ct. at 2036.[23] Only where such considerations pertain does *Mazars* require Congress to explain "why the President's information will advance its consideration of possible legislation." *Id*.

Here, unlike *Mazars*, we address a legislative subpoena issued to a state agency for government records, not a request of Pennsylvania's chief executive for his personal papers. Rather than apply *Mazars*' holding to the particular circumstance for which it was devised, the dissent would require judicial review and approval of every legislative subpoena issued to a state agency before the legislature can expect compliance with its subpoena. This turns separation of powers on its head by making the legislative process subordinate to the judiciary. This is contrary to "the respect due a coordinate branch of government." *Baker*, 369 U.S. at 217.

---

[23] Ironically, *Annenberg*, 2 A.2d 612, and *Lunderstadt*, 519 A.2d 408, are more protective of personal financial information than is *Mazars*, and they protect any citizen, not just the President or Governor. The dissent in *Mazars* would limit Congressional subpoenas for personal financial information to its impeachment powers and not allow such inquiries for the purpose of preparing and proposing legislation. "I would hold that Congress has no power to issue a legislative subpoena for private, nonofficial documents – whether they belong to the President or not." *Mazars*, __ U.S. at __, 140 S. Ct. at 2047 (Thomas, J., dissenting).

Each branch, including the judiciary, must take care not "to exceed the outer limits of its power." *I.N.S. v. Chudha*, 462 U.S. 919, 951 (1983).[24]

In Pennsylvania jurisprudence, the circumstances that have authorized judicial intervention in a legislative subpoena have been exceptional and rare. It must be apparent from the face of the subpoena, or the authorizing legislative resolution, that there is not "even a hint that the investigation" has a legislative purpose. *Lunderstadt*, 519 A.2d at 416 (Hutchinson, J., concurring). Judicial intervention may be appropriate where the legislative committee lacks any power to act because the legislature had adjourned before the committee acted. *Brown*, 184 A. at 92. Equity can be invoked to restrain legislative subpoenas that show "on their

---

[24] The dissent cites the Montana Supreme Court's decision in *McLaughlin v. Montana State Legislature*, 493 P.3d 980 (Mont. 2021), for its summation of federal law on the role of the judiciary and interpretation of *Mazars*. Out-of-state decisions may be cited, at most, for their persuasive authority. *Shedden v. Anadarko E&P Company, L.P.*, 88 A.3d 228, 233 n.3 (Pa. Super. 2014). However, *McLaughlin* is inapposite.

In *McLaughlin*, the Montana Supreme Court quashed legislative subpoenas demanding four months of all emails between the Court Administrator for the Montana Judicial Branch and state judges and justices, as well as the production of state-owned computers and telephones used to communicate with justices on legislation or other matters that could come before Montana courts for a decision. The Montana Supreme Court held that an *in camera* review was needed to "balance competing privacy and security interests" in advance of production. *McLaughlin*, 493 P.3d at 983. The concurring opinion observed that "separation of powers does not tolerate the control, interference or intimidation of one branch of government by another." *Id*. at 997 (McKinnon, J., concurring). The concurrence argued that the subpoena was issued to investigate "purported judicial misconduct" and "expose violation by judges, if not the entire judicial branch of ethical codes, state law and state policy . . . ." *Id*. at 1002. As such, the legislature's investigation was "incongruous to Montana's Constitution and the constitutionally created method for addressing the discipline and removal of judges for misconduct." *Id*.

By contrast, here, no party asserts that an inference of intimidation can be drawn from the Senate Committee's subpoena. Further, to make Pennsylvania's legislative process subordinate to the judiciary is incongruous with separation of powers under our Constitution, as construed by our Supreme Court in *Brandamore*, 327 A.2d 1. *See also Camiel*, 324 A.2d at 866.

29

face that they contemplate an unreasonable search and seizure" in violation of the Fourth Amendment. *Annenberg*, 2 A.2d at 618. Unlike informational privacy, which can be waived by the government where that privacy interest is outweighed by the public interest in disclosure, *PSEA*, 148 A.3d at 158, the government can never waive a citizen's immunity against an unlawful search and seizure. Only the citizen has that power. This is not a Fourth Amendment case, and neither Petitioners nor Voter Intervenors so claim.

This Court cannot assume that the Senate Committee will not be mindful of the informational privacy interests of registered voters:

> *For us to presume that the House of Representatives, the body most susceptible to the will of the people, will be less sensitive to the constitutional rights of the citizen than will be this Court* would authorize a presumption I am not prepared to accept. This would not be exercising a judicial prerogative or a judicial restraint, but *would in truth be judicial arrogance*[.]

*In re Motions to Quash Subpoenas and Vacate Service*, 146 F. Supp. at 795 (emphasis added). The same may be said here.[25] To assume that the Pennsylvania Senate, a body more susceptible to the will of the people than our appellate courts, will have less sensitivity to the informational privacy interests of registered voters "would in truth be judicial arrogance." *Id*.

The subpoena issued by the Senate Committee does not inquire into the Acting Secretary's private and personal affairs or in any way compromise her Fourth Amendment right. The subpoena does not interfere with the Acting Secretary's duties, as agency head, with respect to the Department's administration of the SURE system because the Senate Committee seeks copies, not original documents. In

---

[25] Notably, the Senate Committee's subpoena directed delivery of the documents to counsel, not to the entire Committee. This measure demonstrates "sensitivity" to the information privacy rights of voter information in the SURE system.

*Brown*, 184 A. at 91, by contrast, the House Committee sought the original accounting ledgers and records from the directors of the charitable trusts thereby creating "general disorganization of their trust administration." Finally, the Acting Secretary does not contend that the Senate Committee issued its subpoena after the legislature had adjourned *sine die*, *i.e.*, that it lacked "lawful authority in the premises." *Id.* at 92.

Democratic Senators, the Haywoods, and Voter Intervenors assert that they lack a remedy to challenge the legislative subpoena.[26] However, the private parties may request intervention in whatever enforcement proceeding is undertaken by the Senate Committee, should the matter not be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Mazars*, __ U.S. at __, 140 S.Ct. at 2029. Democratic Senators will participate in that "hurly-burly" process and in the enforcement proceeding should one ever take place.

More to the point, it is the SURE system that has created the risk of exposure of the voter registration information that they seek to protect. 25 Pa. C.S. §1222(c)(5) (permitting "each commission and the department to have instant access to a commission's registration records maintained in the system"). Further, "[r]ecords of a registration commission" may "be inspected during ordinary business hours[.]" 25 Pa. C.S. §1207(a)(1)-(b). Likewise, county election commissions shall prepare street lists for "all registered electors" in each election district for both

---

[26] The dissent cites *Reese v. Pennsylvanians for Union Reform*, 173 A.3d 1143 (Pa. 2017), in support of its opinion. *Reese* is inapposite. *Reese* involved a private party's record request under authority of statute, *i.e.*, the Right-to-Know Law. This matter concerns the legislature's request for records under authority of our Constitution. Notably, public disclosure of records that implicate informational privacy will be allowed "where the public interest favor[s] disclosure." *PSEA*, 148 A.3d at 158.

political bodies and candidates. 25 Pa. C.S. §1403(a)-(c). It is the SURE system that exposes Democratic Senators, the Haywoods, and Voter Intervenors to disclosure of their voter registration information.[27] The SURE system can be accessed by any number of county and state employees, as well as the third-party private consultants engaged by the Department of State and by county commissions that from time to time use that database of voter information.[28] Equity is the vehicle for challenging the constitutionality of a statute that does not sufficiently protect informational privacy. *See*, *e.g.*, *Lynch v. Owen J. Roberts School District*, 244 A.2d 1, 3 (Pa. 1968); *Annenberg*, 2 A.2d 617 (challenging constitutionality of Act 27 that created the commission to study gambling). However, Democratic Senators, the Haywoods, and Voter Intervenors do not challenge the constitutionality of any disclosure provision in the Election Code.

The Acting Secretary has been served in her official capacity as custodian of government records within the Department of State, which is a creature of the legislature. *See* Section 801 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 271. The Department has been established to serve as a repository of documents, from corporate charters to professional licenses as well as election-related materials, which are the subject of the subpoena. *See also* Section 802 of The Administrative Code of 1929, 71 P.S. §272 (establishing duty in Department of State to furnish records that a legislative committee may

---

[27] Both Democratic Senators and Voter Intervenors had the very same opportunity to make these arguments and participated in argument before the Court in the Committee's enforcement attempt, as addressed in *Pennsylvania Senate Intergovernmental Operations Committee*, __ A.3d at __, slip op. at 5.

[28] Likewise, the Pennsylvania Department of Transportation, the Social Security Administration, and the Internal Revenue Service hold this personal information of registered voters, which is accessed by employees and agents of those government agencies.

32

request from time to time).[29]  A legislative subpoena for government records is not measured by *Annenberg* or *Lunderstadt*, which address requests for private financial documents.

The Senate Committee cannot set up itself as a court of law to set aside certified election results.[30]  *Commonwealth v. Costello*, 21 Pa. D. 232, 237 (1912). Nor can the Senate Committee set up itself as a grand jury or prosecutor.  *Annenberg*, 2 A.2d at 617.  However, it cannot be inferred from the face of the Committee's subpoena for election-related records that its investigation lacks even a "hint" of a legislative purpose but only a law enforcement purpose.  *Lunderstadt*, 519 A.2d at 416 (Hutchinson, J., concurring).  Indeed, the Committee's subpoena "must be presumed to have had a legitimate object, if it is capable of being so construed, and the court has no right to assume that the contrary was intended[.]"  *Costello*, 21 Pa. D. at 234-35.  Finally, the Senate Committee did not issue the subpoena after the

---

[29] Section 802 of The Administrative Code of 1929 provides, in pertinent part, as follows:

> The Department of State shall have the power and its duty shall be:
>
> (a)  *To permit any committee of either branch of the General Assembly to inspect and examine the books, papers, records, and accounts, filed in the department, and to furnish such copies or abstracts therefrom, as may from time to time be required*;
>
> (b)  To furnish to any person, upon request and the payment of such charges as may be required and fixed by law, certificates of matters of public record in the department, or certified copies of public papers or documents on file therein.

71 P.S. §272 (emphasis added).

[30] Relying on statements of individual Senators, Petitioners and Voter Intervenors assert that the true motive of the Senate Committee is a "concerted effort to cast doubt on the results of the 2020 presidential election[.]"  Acting Secretary's Petition for Review, ¶140.  However, "the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (cited with approval in *Brandamore*, 327 A.2d at 4).  *See also United States v. O'Brien*, 391 U.S. 367, 383 (1968) (inquiries into legislative motives "are a hazardous matter").

legislature's adjournment, at a time when it was "without lawful authority in the premises." *Brown*, 184 A. at 92.

The exceptional circumstances that warrant the exercise of equity jurisdiction to restrain a legislative subpoena before confrontation are not present in this case. When, and if, the Senate Committee chooses to enforce the subpoena *duces tecum*, the Acting Secretary can be heard and her concerns addressed in a proceeding that must conform to due process. *Brandamore*, 327 A.2d at 5. If the Senate Committee's enforcement proceeding does not provide the Acting Secretary due process, that is the "point in the proceeding" at which to involve the judiciary. *Camiel*, 324 A.2d at 866.

## Conclusion

We are asked to interfere with legislative process. As this Court has explained,

> [i]f there is any one principle of constitutional law which supports and protects our form of government, including all of our constitutional rights, it is separation of powers among the three branches of government. Every crack in this foundation weakens the entire structure.

34

*Camiel*, 324 A.2d at 866. When it comes to the legislature's enforcement of its process, our Supreme Court has directed that "[a] proper respect for the limits of the judicial function and the doctrine of separation of powers dictates that we leave matters to the legislature." *Brandamore*, 327 A.2d at 4. Consistent with *Camiel* and in respect of the separation of powers, we decline to exercise this Court's equity jurisdiction to restrain enforcement of the Senate Committee's subpoena in advance of confrontation. Judicial intervention at this juncture may only "needlessly disturb the compromises and working arrangements" of the political branches. *Mazars*, __ U.S. at __, 140 S.Ct. at 2031. Accordingly, the consolidated petitions for review challenging the subpoena *duces tecum* issued by the Senate Committee, and seeking declaratory and injunctive relief, are dismissed.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Judge McCullough, Judge Covey, Judge Fizzano Cannon and Judge Wallace did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Senator Jay Costa, Senator Anthony H. Williams, Senator Vincent J. Hughes, Senator Steven J. Santarsiero and Senate Democratic Caucus, | : | **CASES CONSOLIDATED** |
| Petitioners | : | |
| | : | |
| v. | : | No. 310 M.D. 2021 |
| | : | |
| Senator Kim Ward and Senator Jarrett Coleman, | : | |
| Respondents | : | |
| | : | |
| Commonwealth of Pennsylvania, Pennsylvania Department of State, and Leigh M. Chapman, Acting Secretary of the Commonwealth of Pennsylvania, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 322 M.D. 2021 |
| | : | |
| Senator Jarrett Coleman, Senator Kim Ward and The Pennsylvania State Senate Intergovernmental Operations Committee, | : | |
| Respondents | : | |
| | : | |
| Arthur Haywood Julie Haywood, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 323 M.D. 2021 |
| | : | |
| Leigh M. Chapman Acting Secretary of State Commonwealth of Pennsylvania, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 9th day of February, 2023, the petitions for review filed in the above-captioned consolidated matters are DISMISSED.

_____
MARY HANNAH LEAVITT, President Judge Emerita

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Senator Jay Costa, Senator                   :
Anthony H. Williams, Senator                 :
Vincent J. Hughes, Senator                   :
Steven J. Santarsiero and Senate             :
Democratic Caucus,                           :
                     Petitioners    :
                                     :
           v.                    : No. 310 M.D. 2021
                                       :
Senator Kim Ward and Senator                 :
Jarrett Coleman,                             :
                     Respondents    :


Commonwealth of Pennsylvania,                :
Pennsylvania Department of State,            :
and Leigh M. Chapman, Acting                 :
Secretary of the Commonwealth                :
of Pennsylvania,                             :
                     Petitioners    :
                                       :
           v.                    : No. 322 M.D. 2021
                                     :
Senator Jarrett Coleman, Senator Kim         :
Ward and The Pennsylvania State              :
Senate Intergovernmental Operations          :
Committee,                                   :
                     Respondents    :


Arthur Haywood                               :
Julie Haywood,                               :
                     Petitioners    :
                                       :
           v.                    : No. 323 M.D. 2021
                                     : Argued:  September 12, 2022
Leigh M. Chapman                             :
Acting Secretary of State                    :
Commonwealth of Pennsylvania,                :
                     Respondent     :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE MARY HANNAH LEAVITT, Senior Judge


DISSENTING OPINION
BY JUDGE WOJCIK                              FILED:  February 9, 2023


I dissent.

As noted by the Majority, subsequent to our denial of the parties' applications for summary relief in the above-captioned cases, we directed them to address three questions for disposition herein:  (1) whether the petitions for review (PFRs) are ripe for review; (2) whether the availability of an adequate remedy at law precludes this Court's exercise of equity jurisdiction[1] over a challenge to the

---

[1] In the PFRs filed in these matters, the parties invoke our authority under the Declaratory Judgments Act (DJA), 42 Pa. C.S. §§7531-7541.  As this Court has explained:

> Petitions for declaratory judgments are governed by the provisions of the [DJA].  Although the [DJA] is to be liberally construed, one limitation on a court's ability to issue a declaratory judgment is that the issues involved must be ripe for judicial determination, meaning that there must be the presence of an actual case or controversy.  Thus, the [DJA] requires a petition praying for declaratory relief to state an actual controversy between the petitioner and the named respondent.
>
> Declaratory judgments are not obtainable as a matter of right.  Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion.  Thus, the granting of a petition for a declaratory judgment is a matter lying within the sound discretion of a court of original jurisdiction.  As the Pennsylvania Supreme Court has stated:
>
> > The presence of antagonistic claims indicating imminent and inevitable litigation coupled with a

**(Footnote continued on next page…)**

MHW-2

legislative subpoena; and (3) whether the General Assembly's enforcement power or the criminal contempt statute preclude this Court's exercise of equity jurisdiction. *See* Court Order, 1/25/2022. I firmly believe that the Majority has incorrectly answered each of the foregoing questions, and the Majority's attempt to distinguish precedent establishing a contrary conclusion is unavailing.

---

clear manifestation that the declaration sought will be of practical help in ending the controversy are essential to the granting of relief by way of declaratory judgment. . . .

Only where there is a real controversy may a party obtain a declaratory judgment.

A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic.

*Brouillette v. Wolf*, 213 A.3d 341, 357-58 (Pa. Cmwlth. 2019) (citations omitted). In addition, "an action seeking declaratory judgment is not an optional substitute for established or available remedies and should not be granted where a more appropriate remedy is available." *Pittsburgh Palisades Park, LLC v. Pennsylvania State Horse Racing Commission*, 844 A.2d 62, 67 (Pa. Cmwlth. 2004) (citation omitted). Nevertheless, as outlined below, this Court's consideration of the merits of the instant PFRs in our original jurisdiction is the most appropriate remedy for consideration of the claims raised herein. *See, e.g.*, *Commonwealth ex rel. Carcaci v. Brandamore*, 327 A.2d 1, 5 n.4 (Pa. 1974) ("Had [the state trooper] wished to challenge the constitutionality of the committee's investigation without risking a contempt citation before the bar of the House, judicial recourse would have been available to him. Injunctive relief from the activities of the committee could have been sought in a court of equity. *See McGinley v. Scott*, [164 A.2d 424 (Pa. 1960)]; *Annenberg v. Roberts*, [2 A.2d 612 (Pa. 1938)]."); *see also Camiel v. Select Committee on State Contract Practices of House of Representatives*, 324 A.2d 862, 866 (Pa. Cmwlth. 1974) ("As was held in [*Annenberg*], a court sitting in equity may restrain public officers to protect a citizen's constitutional rights after service of a subpoena and before a confrontation; but the action before us is not in equity.").

Although not cited by the Majority, the United States Supreme Court has squarely addressed the role of the judiciary where, as here, there is a challenge to an interbranch legislative subpoena that is directed to another separate and coequal branch of government. In *McLaughlin v. Montana State Legislature*, 493 P.3d 980, 985-86 (Mont. 2021), the Montana Supreme Court[2] recently summarized the relevant United States Supreme Court precedent as follows:

> The legislative branch is not a law enforcement agency; its inquiry "must be related to, and in furtherance of, a legitimate task of the [Legislature]." *Watkins* [*v. United States*, 354 U.S. 178, 187 (1957)]. To serve a "valid legislative purpose," the subpoena "must 'concern[] a subject on which legislation "could be had.'" [*Trump v.*] *Mazars* [*USA, LLP*, 140 S. Ct. 2019, 2031 (2020)] (quoting *Eastland v.* [*United States*] *Servicemen's Fund*, 421 U.S. 491, 506 [(1975)]). "The investigatory power of a legislative body is limited to obtaining information on matters that fall within its proper field of legislative action." [P. Mason, Manual of Legislative Procedure], §797.7 at 567 [(2020)]. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins*,

---

[2] In *McLaughlin*, the Court Administrator for the Montana Judicial Branch initiated an original proceeding in the Montana Supreme Court seeking to quash and permanently enjoin a series of interbranch legislative subpoenas issued by the Montana Legislature to obtain a number of items including the Court Administrator's and another judicial branch employee's emails, and a poll of the members of a judicial organization that the Court Administrator had facilitated relating to a bill that was then pending before the Legislature. *See McLaughlin*, 493 P.3d at 983-84. Relevant to our discussion herein is the court's summary of United States Supreme Court precedent controlling a court's consideration in an original action seeking to quash an interbranch legislative subpoena, as outlined above. *See, e.g.*, *Commonwealth v. Stilp*, 905 A.2d 918, 940-44 (Pa. 2006) (citing relevant United States Supreme Court and Illinois Supreme Court precedent while considering the separation of powers doctrine with respect to the constitutional protection against diminishing judicial compensation); *see also Delaware Valley Landscape Stone, Inc. v. RRQ, LLC*, 284 A.3d 459, 463 n.5 (Pa. Super. 2022) ("This Court may rely on the decisions of other states for persuasive authority. *See Hill v. Slippery Rock Univ*[*ersity*], 138 A.3d 673, 679 n.3 (Pa. Super. 2016) (noting that 'the decisions of other states are not binding authority for this Court, although they may be persuasive' (citation omitted))").

354 U.S. at 178[.] And "'there is no congressional power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins*, 354 U.S. at 200[]).

In *Mazars*, the Court examined Congressional subpoenas seeking the President's information under the lens of separation of powers, announcing a non-exhaustive series of safeguards—in contrast to the generally applicable presumption stated in *McGrain* [*v. Daugherty*, 273 U.S. 135 (1927)]—when the legislative subpoena authority is directed at another branch of government. "First, courts should carefully assess whether the asserted legislative purpose warrants the significant step" of issuing the subpoena, because "occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Mazars*, 140 S. Ct. at 2035 (citation, internal quotations omitted). In this regard, the legislative body may not compel information from a coequal branch of government "if other sources could reasonably provide" the information necessary for "its particular legislative objective." *Mazars*, 140 S. Ct. at 2035-36.

Second, "to narrow the scope of possible conflict between the branches," the subpoena must be "no broader than reasonably necessary to support [the] legislative objective." *Mazars*, 140 S. Ct. at 2036.

Third, courts must examine the asserted legislative purpose and the "nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. The legislative body must "adequately identif[y] its aims and explai[n] why the [requested] information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036. "[D]etailed and substantial . . . evidence of . . . legislative purpose" is "particularly" important when the legislative body "contemplates legislation that raises sensitive constitutional issues, such as legislation concerning the Presidency" or—in this case—the Judiciary. *Mazars*, 140 S. Ct. at 2036.

Finally, in the context of considering the burden an interbranch subpoena imposes, courts must "carefully scrutinize[]" such subpoenas, "for they stem from a rival political branch" with "incentives to use subpoenas for institutional advantage." *Mazars*, 140 S. Ct. at 2036.[3]

The Majority's attempt to limit the application of a *Mazars* analysis to a legislative subpoena directed to obtain the personal papers of an executive branch official is simply incorrect. As indicated, in *McLaughlin*, the legislative subpoena was directed to judicial branch officials to obtain records maintained by that separate and coequal branch in the furtherance of its governmental function. Likewise, the records sought herein relate to the private information of the more than 9,000,000 registered electors of this Commonwealth that are maintained by the Acting Secretary of State as part of her governmental function.

The Majority's reliance on *Camiel v. Select Committee on State Contract Practices of House of Representatives*, 324 A.2d 862 (Pa. Cmwlth. 1974), is simply misplaced because that case did not involve an interbranch legislative

_____

[3] In *McLaughlin*, after conducting the foregoing analysis, the court ultimately held:

> Acknowledging the Legislature's authority to obtain information in the exercise of its legislative functions under the Montana Constitution, we conclude that the subpoenas in question are impermissibly overbroad and exceed the scope of legislative authority because they seek information not related to a valid legislative purpose, information that is confidential by law, and information in which third parties have a constitutionally protected individual privacy interest. We hold further that, if the Legislature subpoenas records from a state officer like the Court Administrator auxiliary to its legislative function, whether those records be in electronic or other form, a Montana court—not the Legislature—must conduct any needed *in camera* review and balance competing privacy and security interests to determine whether records should be redacted prior to disclosure.

*McLaughlin*, 493 P.3d at 983.

subpoena such as the one at issue in the above-captioned matters.[4]  Moreover, *Camiel* does not support judicial abdication as the Majority suggests because, unlike this case, *Camiel* was not an action seeking equitable relief.  *See Camiel*, 324 A.2d at 866 ("As was held in *Annenberg v. Roberts*, [2 A.2d 612 (Pa. 1938)], a court sitting in equity may restrain public officers to protect a citizen's constitutional rights after service of a subpoena and before a confrontation; but the action before us is not in equity.").  Thus, regardless of the standard to be applied herein, *i.e.*, either a *Mazars* analysis or the "materiality" analysis set forth in *Lunderstadt v. Pennsylvania House of Representatives Select Committee*, 519 A.2d 408 (Pa. 1986),[5] judicial intervention is appropriate at this point and we need not wait until a further "confrontation" occurs.

Furthermore, where, as here, an interbranch legislative subpoena seeks the Acting Secretary of State's records containing constitutionally protected private and confidential information, the legislative necessity for the records' release must be weighed against the constitutional right to informational privacy.  Indeed, as the Pennsylvania Supreme Court has observed:

---

[4] Equally troubling is the Majority's citation to the single-judge order in *Applewhite v. Commonwealth* (Pa. Cmwlth., No. 330 M.D. 2012, order filed April 29, 2013), to support the disclosure of this constitutionally protected private and confidential information that predates the Pennsylvania Supreme Court's opinion in *Pennsylvania State Education Association v. Department of Community and Economic Development*, 148 A.3d 142 (Pa. 2016).

[5] *See Lunderstadt*, 519 A.2d at 414 ("[W]e believe that the views of Mr. Justice Holmes [in *Federal Trade Commission v. American Tobacco Co.*, 264 U.S. 298, 305-07 (1924),] are persuasive insofar as they reflect a need to protect individuals from 'fishing expeditions,' and, likewise, to the extent that a requirement as to the 'materiality' of subpoenaed records should be imposed.  Such protections for privacy interests can, however, be afforded under the Pennsylvania Constitution."); *see also Annenberg*, 2 A.2d at 617-18 ("[I]t is uniformly held that a legislative body is not invested with any general power to inquire into private affairs and to compel disclosures but only with such limited right of inquiry as is pertinent to the obtaining of information upon which proposed legislation is to be based.").

In [*Pennsylvania State Education Association v. Department of Community and Economic Development*, 148 A.3d 142 (Pa. 2016) (*PSEA*)], this Court examined Pennsylvania's constitutional protections for informational privacy and the scope of the "personal security" exception in [S]ection [] 708 of the [Right-to-Know Law (RTKL).[6]] Reviewing numerous prior decisions of both this Court and our intermediate appellate courts, we reaffirmed that the citizens of this Commonwealth, pursuant to [a]rticle I, [s]ection 1 of the Pennsylvania Constitution,[7] have a right to informational privacy, namely the right of an individual to control access to, and dissemination of, personal information about himself or herself. *PSEA*, 148 A.3d at 150. Accordingly, we ruled that ***before the government may release personal information, it must first conduct a balancing test to determine whether the right of informational privacy outweighs the public's interest in dissemination***. *Id.* at 144. In so ruling, we were clear that while this balancing test has typically been located in the "personal security" exemption of the [predecessor to the RTKL, (and later in the RTKL)], it is not a statutory, but rather a constitutional requirement, and ***it is required even in the absence of any statutory requirement***. *Id.* at 156. As such, ***the PSEA balancing test is applicable to all government disclosures of personal information, including those not mandated by the RTKL or another statute***.

*Reese v. Pennsylvanians for Union Reform*, 173 A.3d 1143, 1159 (Pa. 2017) (emphasis added). Thus, any purported ***statutory*** requirement that the Acting

---

[6] Act of February 14, 2008, P.L. 6, 65 P.S. §67.708.

[7] Pa. Const. art. I, §1. Article I, section 1 states:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

MHW-8

Secretary must release all of the requested records pursuant to Section 1 of the Act of March 12, 1791,[8] or Section 802(a) of The Administrative Code of 1929[9] must be balanced against the ***constitutional*** privacy rights that the over 9,000,000 electors have in their personal information contained in the Acting Secretary's records. *Id.*[10]

In light of the foregoing, and contrary to the Majority's conclusions, I am convinced that (1) the PFRs are ripe for review because the interbranch conflict between the executive and legislative branches of our Commonwealth government precipitated by the Senate Committee's subpoena remains extant; (2) the availability of an adequate remedy at law via participation or intervention in an enforcement proceeding does not preclude this Court's exercise of equity jurisdiction over a challenge to the legislative subpoena; and (3) the General Assembly's enforcement

---

[8] Act of March 12, 1791, 3 Sm.L. 8, 71 P.S. §801. Section 1 states, in relevant part, that "[t]he books, papers and accounts of the [S]ecretary [of the Commonwealth] shall be open to the inspection and examination of committees of each branch of the legislature, and [the S]ecretary shall furnish such copies, or abstracts, therefrom, as may from time to time be required."

[9] Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §272(a). Section 802(a) states, in pertinent part, that "[t]he Department of State shall . . . permit any committee of either branch of the General Assembly to inspect and examine the books, papers, records, and accounts, filed in the [Department of State], and to furnish such copies or abstracts therefrom, as may from time to time be required[.]"

[10] Both the Pennsylvania Supreme Court and the Pennsylvania General Assembly have recognized that some of the information requested by the interbranch legislative subpoena constitutes the protected, private, personal information of the Commonwealth's registered electors. *See, e.g.*, Pa. R.J.A. 509(b)(2) ("All financial records are accessible to the public except . . . any part of a record setting forth a person's social security number, home address, home telephone number, date of birth, operator's license number, e-mail address, or other personal information[.]"); Section 708(b)(6)(i)(A) of the RTKL, 65 P.S. §67.708(b)(6)(i)(A) ("Except as provided in subsections (c) and (d), the following are exempt from access by a requester under this act: . . . The following personal identification information: . . . A record containing all or part of a person's Social Security number, driver's license number, personal financial information, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number.").

power or the criminal contempt statute does not preclude this Court's exercise of equity jurisdiction. In sum, contrary to the Majority, I would not abdicate this Court's constitutional and statutory responsibility[11] to review the merits of the constitutional and statutory claims raised in the instant PFRs as a separate independent and coequal branch of this Commonwealth's government.

Finally, and quite importantly, I firmly believe that the instant matter should be considered, and disposed of, by an en banc panel of the commissioned judges of this Court. As it has been explained:

---

[11] Indeed, as the *McLaughlin* Court explained:

> The Supreme Court's decisions on Congressional subpoenas make clear that the courts have a role regardless of the office or the government stature of the subject to whom the subpoena pertains. [*See, e.*]*g.*, *Mazars*, 140 S. Ct. at 2035 ("[S]eparation of powers concerns are no less palpable here simply because the subpoenas were issued to third parties. Congressional demands for the President's information present an interbranch conflict no matter where the information is held."). The *Mazars* Court harkened the two-century tradition of the political branches "resolv[ing] information disputes using the wide variety of means that the Constitution puts at their disposal." *Mazars*, 140 S. Ct. at 2035. But it did so in preface to its prescription of the "balanced approach" the courts must take when the branches reach impasse, accounting for "both the significant legislative interests of Congress and the 'unique position' of [in that case] the President." *Mazars*, 140 S. Ct. at 2035. ***The "practice of the government" to avoid such interbranch confrontation informs the courts' consideration of the controversy but does not abrogate their obligation to decide it***. Although the *Mazars* Court examined Congressional subpoenas to the Executive, its articulated "balanced approach" extends logically to subpoenas to the judicial branch, which raise similar "interbranch confrontation" concerns.

*McLaughlin*, 493 P.3d at 987-88 (emphasis added).

MHW-10

Cases assigned to an en banc court for argument and decision will generally involve:

1.  Substantial questions of federal or state constitutional law;

2.  Substantial questions of state-wide importance;

3.  Substantial questions of first impression involving statutory or regulatory interpretation; and

4.  The possibility of overruling Commonwealth Court precedent.

G. Darlington, K. McKeon, D. Schuckers, K. Brown, & P. Cawley, Pennsylvania Appellate Practice §3103:6 (West 2022-2023 ed.) (footnotes omitted); *see also* Pa. R.A.P. 2543 ("Reargument before an appellate court is not a matter of right, but of sound judicial discretion, and reargument will be allowed only when there are compelling reasons therefor."); *Gajkowski v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 548 A.2d 533, 535 (Pa. 1988) ("*In Dozer Agency, Inc. v. Rosenberg*, [246 A.2d 330, 331 (Pa. 1968)], the Court filed an opinion on March 22, 1966, and remanded for a re-evaluation of damages. A petition for reargument was timely filed and denied. 'Sometime thereafter, this Court, *sua sponte* determined that reargument should be held limited to the question of the adequacy of the damages awarded by the court below and such reargument was held.'"); *Charles v. Giant Eagle Markets*, 510 A.2d 350 (Pa. 1986) ("[T]he Court, *sua sponte*, orders that the above matter be reargued during the September 1986 Session in Pittsburgh."); *Farnell v. Winterloch Corporation*, 527 A.2d 204, 205 (Pa. Cmwlth. 1987) ("Argument on this case was held before a panel . . . in December of 1985. We *sua sponte* ordered reargument before the court en banc which was held in December of 1986. The matter is now ready for our disposition."); *Alliston v. City of Allentown*, 455 A.2d 239, 240 n.2 (Pa. Cmwlth.

1983) ("This case was originally argued before a panel but was set down for reargument before the court en banc in September 1982 because of the important issue presented in this appeal."); *Bern Township Authority v. Hartman*, 451 A.2d 567, 568 (Pa. Cmwlth. 1982) ("This case has been reargued before the court en banc because it poses these two important questions . . . ."). Because the disposition of these cases involves substantial fundamental constitutional and statutory questions, they should be resolved by an en banc panel of the commissioned judges of this Court.

Accordingly, as outlined above, the above-captioned matters should be reargued before, and disposed of by, an en banc panel of the commissioned judges of this Court. In the alternative, on the merits, unlike the Majority, I would not deny and dismiss the PFRs filed in these cases.

_____
MICHAEL H. WOJCIK, Judge